UNITED STATES of America,
Plaintiff,

v.

INGERSOLL-RAND COMPANY, Goodman Manufacturing Company, Lee-Norse Company and Galis Electric and Machine Company, Defendants.

Civ. A. No. 63-124.

United States District Court
W. D. Pennsylvania.

April 11, 1963.

Donald F. Melchior, John M. O'Donnell, P. Jay Flocken, Department of Justice, Washington, D. C., for plaintiff.

Austin, Burns, Appell & Smith, Joseph Burns, New York City, for defendant Ingersoll-Rand Co.

Aaron, Aaron, Schimberg & Less, Chicago, Ill., for defendant Goodman Mfg. Co.

Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for defendant Lee-Norse Co.

Haden & Haden, Morgantown, W. Va., for defendant Galis Electric & Machine Co.

ROSENBERG, District Judge.

### INTRODUCTORY STATEMENT

Findings of fact, conclusions of law and this opinion are presented subsequent to and in support of the issuance of an order by this Court on the 6th day of March 1963, preliminarily restraining the defendants from consummating agreements contemplating specific corporate acquisitions in the underground coal mining machinery production as a line of commerce in the United States.

On March 4, 1963, a second order was issued denying a proposed modification of the Court's original order. A supple-

mental opinion relating to the second order will follow.

Ingersoll-Rand Company (Ingersoll-Rand) entered into three separate agreements, all dated January 16, 1963, with defendants, Goodman Manufacturing Company (Goodman), Lee-Norse Company (Lee-Norse) and Galis Electric and Machine Company (Galis).

The agreement with Goodman provides that Ingersoll-Rand will acquire certain of the assets of the mining and rock crushing machinery and industrial manufacturing business of Goodman for the consideration of 8 million dollars. The agreement further states that from the date of closing the Goodman name will not be used in any related type business and the closing date was stipulated to be March 1, 1963, unless properly extended.

The agreement with Lee-Norse provides that Ingersoll-Rand and Lee-Norse enter into a Plan and Agreement of Reorganization, wherein a wholly owned subsidiary of Ingersoll-Rand (to be known as the Goodman-Norse Company) will purchase all property of Lee-Norse in exchange for a quantity of Ingersoll-Rand voting stock. Within twelve months after closing, Lee-Norse will dissolve and distribute its remaining assets, comprising the Ingersoll-Rand voting stock, to its shareholders. The closing date of this agreement is also listed as March 1, 1963, unless properly extended.

The agreement with Galis provides that Ingersoll-Rand and Galis entered into a Plan of Reorganization pursuant to which Ingersoll-Rand will acquire all issued and outstanding shares of Galis stock in exchange for shares of common stock of Ingersoll-Rand, and that all officers and directors will resign. The

closing date shall be March 1, 1963, unless properly extended.

When the United States Government received on or about December 5, 1962, a published report of the impending merger, the Anti-Trust Division of the Department of Justice made contact with Ingersoll-Rand by letter dated December 6, 1962. It inquired about the proposed merger and received in response a letter from counsel for Ingersoll-Rand dated December 12th, advising the Government that Ingersoll-Rand would assemble and forward the necessary information. On January 16, 1963, Ingersoll-Rand did provide some information concerning the proposed acquisition, including information that March 1, 1963, was to be the closing date of the Lee-Norse contract.

The Government then requested additional information and served upon the merging companies a Civil Investigative Demand returnable on February 25th. At this time, the Government also requested assurance from these companies that it would be advised in advance of any closing of a proposed acquisition, but the companies indicated their reluctance to become so bound. Thereupon, on February 14th, the United States, as plaintiff, filed its complaint and supporting affidavits charging that the defendants, Ingersoll-Rand, Goodman, Lee-Norse and Galis had entered into the various agreements for acquisition mergers which were in imminence of being consummated, and if consummated, would violate Section 7 [1] of the Act of Congress of October 15, 1914, c. 323, 38 Stat. 736, as amended by the Act of Congress of December 29, 1950, c. 1184, 64 Stat. 1125, 15 U.S.C.A. § 18, commonly known as the Clayton Act.

In reliance upon the plaintiff's complaint and affidavits, which has been set

---

1. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

forth here in some detail, I granted a Temporary Restraining Order on the same day, Thursday, February 14th. Immediately after receiving notice, the defendants on Monday, February 18th, filed in this court a Motion to Vacate and Dissolve the Temporary Restraining Order. A hearing was ordered and had on Thursday, February 21st, to permit the defendants to present testimony in support of their motion, and at the same time to hear the plaintiff on its motion for production of documents by the defendants.

For this hearing, each side presented memorandum briefs. In their brief, the defendants at page 7 stated: "However, defendants will now show that even if notice had been given, no temporary order should have been issued." Accordingly, the defendants were allowed such opportunity as they desired to "show" that this statement could be supported, while the plaintiff was required to justify the issuance of the temporary restraining order. After a full day's hearing, I denied the motion to vacate the order and directed preparation by the parties for the preliminary hearing on the following Monday, February 25th.

The preliminary hearing proceeded as scheduled in the following week, during which time the parties presented many witnesses and documents to support their respective contentions. The hearing closed on the following Friday, and within a day or two, the parties submitted briefs, requests for findings of fact and conclusions of law. After careful examination of the parties' briefs and considerable research, within the time allotted by law, I issued the preliminary injunction order to maintain the status quo until a permanent decision might be had after a final hearing. Immediately after issuance of the preliminary injunction, the defendants filed a motion for a modification of the preliminary order, and after hearing all the parties, that motion was denied.

As already stated, the plaintiff contends that the acquiring by the defendant, Ingersoll-Rand, of the stock and assets of the other defendants, Goodman, Lee-Norse and Galis, would be an acquisition in a line of commerce in the United States, the effect of which may be to substantially lessen competition or to tend to create a monopoly, and that such is forbidden by Section 7 of the Clayton Act.

The defendants contest the validity of the plaintiff's case by attempting to show:

1. That the plaintiff did not support its case by proper evidence;

2. That the plaintiff's statistics are erroneous or improperly compiled;

3. That the action pursued by the Attorney General in this particular case is unjust;

4. That if the defendants are eventually proven to be in violation of the Clayton Act, divestiture would be a less harmful procedure than the issuance of a preliminary injunction;

5. That the plaintiff has shown no irreparable injury;

6. That, conversely, the defendants are being irreparably injured by this action;

7. That the defendants, Goodman and Lee-Norse are not competitive within the meaning of the Clayton Act;

8. That the production of underground coal mining machinery and equipment is not a line of commerce within the meaning of the Clayton Act; and

9. That the coal mining industry is in need of this merger.

In proceeding with the hearing for a preliminary injunction, it was incumbent upon the Court to bear in mind the pertinent language of Section 7 of the Clayton Act and to consider leading court decisions interpreting this section. Both sides introduced substantial evidence from which a basic determination could be made of whether or not Section 7 was seriously threatened with violation by the defendants, and if such violation was imminent, to determine whether or not a temporary injunction should issue

in order to preserve the status quo until a permanent hearing on the full merits could be had.

■ Approximately 800 pages of testimony were compiled at the hearings and transcribed by two court reporters working day and night to make the record available on a day to day basis. All of the parties were given full opportunity and ample time in which to present all of the evidence they wished to submit, without hindrance or limitation. I was mindful of the fact that all parties should have such an opportunity. See Sims v. Greene, 3 Cir., 161 F.2d 87 (1947).

The evidence of the parties consisted of both testamentary and documentary proof. Originally, both sides introduced affidavits which were later modified or varied by oral evidence. On the Friday evening of the fifth day of trial, the parties agreed that they had fully presented their respective cases, and that they did not wish to continue into the next week.

Because of the abundance of testimony, it was necessary for me to sift and evaluate the evidence in the light of the provisions of the Clayton Act and leading judicial authority, including United States v. E. I. DuPont De Nemours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1960); United States v. Brown Shoe Co., Inc., 179 F. Supp. 721 (E.D.Mo.1959); affirmed 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 501 (1962). Because of the extended amount of evidence produced, an effort is here made to translate the material evidence into findings of fact, numerous as they may be. Again, it has not been my intention to consider that evidence as finalizing the case, but only in such character as to guide me into making a preliminary determination. Because objections were made to portions of the evidence in this case, and because I stat-ed that certain evidence would be received subject to admission or refusal of admission into evidence after consideration, a clarification is here made of what was and what was not accepted.

In the preparation of its case, the plaintiff relied heavily upon its statistical data originally compiled in Exhibits GX100 through GX108. These were later modified by GX82, which is the Futoran affidavit showing the final government statistics as adjusted by information received by the plaintiff from the defendants pursuant to a stipulation agreed upon on February 21, 1963.

Preliminarily, the plaintiff presented 49 exhibits by way of an affidavit prepared by John M. O'Donnell, Esquire, which generally consisted of an exchange of correspondence between the plaintiff and defendants. Through this correspondence, the plaintiff received some information as to the relative size and standing of the defendant corporations in the coal mining industry. In this way, too, the plaintiff received the following significant documents: copies of the acquisition contracts[2]; the Goodman Manufacturing Company Annual Report to the Stockholders[3]; the Ingersoll-Rand Annual Report to the Stockholders[4]; and the Security Exchange Commission Registration Statement of Lee-Norse[5].

Pursuant to that stipulation as entered into by the parties on February 21st, the defendants provided the plaintiff with other pertinent documents which formed the basis of the plaintiff's statistical analysis. These included the Ingersoll-Rand-Wearly Report[6]: The Ingersoll-Rand-Ford, Bacon & Davis Report and Supplement[7]; and certain responses to interrogatories and questions advanced by the Government to the various defendants[8]. The information supplied in these documents was considered in rela-

2. Exhibit GX11, 12, 13.

3. Exhibit GX30.

4. Exhibit GX8.

5. Exhibit GX42.

6. Exhibit GX50.

7. Exhibit GX51, 52.

8. Exhibit GX75A, 76, 77.

tion to all of the evidence in the case as a whole in making a determination to issue a preliminary injunction.

Besides the information furnished by the defendants to the plaintiff, the defendants admitted during the course of the hearing, that they conceded the accuracy of the figures listed in the Government's Exhibits GX106, 107 and 108. These documents reflected statistics compiled by the United States Bureau of Census and the Business and Defense Service Administration, United States Commerce Department and the Bureau of Mines, Department of Interior. Accordingly, I considered and gave weight to such accuracy as the figures reflected from these sources, as taken in relation to the evidence as a whole.

I disregarded certain affidavits of the parties because of the purpose for which they were offered, such as the plaintiff's Hugo C. Nyquist affidavit [9] and the J. D. A. Morrow affidavit [10], and the defendants' William L. Wearly affidavit[11].

### AFFIDAVITS

The defendants contend that the plaintiff has failed to establish its case because it chose to rely upon the affidavit of Joseph Futoran whom they did not cross-examine. The defendants maintain that this expert, utilized by the plaintiff, and who prepared the statistics upon which the plaintiff relied, was available in court during the hearing and that he should have been placed upon the stand by the plaintiff, and have been subjected to cross-examination by the defendants.

The defendants deny the competency of these prepared documents to sustain a preliminary injunction since counteraffidavits were presented. They cite in support of their argument the following cases: Warner Brothers Pictures, Inc., v. Gittone, 3 Cir., 110 F.2d 292 (1940): and Murray Hill Restaurant, Inc., v. Thirteen Twenty One Locust, 3 Cir., 98 F.2d 578 (1938).

The defendants' objection here is without merit because:

a. the cases cited by the defendants are not applicable;

b. during the course of the hearing, the defendants did in fact have the opportunity to cross-examine the witness;

c. the defendants' affidavits dealt with different matter than that of the Futoran exhibits;

d. the evidence, as a whole, presented by the plaintiff is sufficiently well-founded to sustain the preliminary injunction; and

e. defendants are inconsistent in this argument.

An examination of the cases relied upon by the defendants shows that they are distinguishable from the instant case because in the cited cases, the supporting evidence consisted solely of bare affidavits without any oral testimony. It was held that while the granting of a preliminary injunction is discretionary, where affidavits furnish the only evidence, a preliminary injunction should not be granted unless there is a clear case. It will be noted that a preliminary injunction may be issued upon mere affidavits in a "clear case". In Warner Brothers Pictures, Inc., supra, the Court stated 110 F.2d at page 293:

"The evidence was conflicting and the trial judge, in order to enable him to resolve these conflicts, should have been afforded the opportunity of testing the credibility of the witnesses by having the benefit of their cross-examination and, if possible, their presence in court. In the absence of such opportunity the affidavits of each side were entitled to equal weight."

Regardless of the above cases, in the instant case, I relied upon much more than the information furnished by the original affidavits submitted by the parties. Through the witnesses presented

9. Exhibit GX79.

10. Exhibit GX80.

11. Exhibit DX–D.

by both the plaintiff and the defendants, I did have the opportunity to test credibility of witnesses and weigh the probative value of the exhibits in accordance with the applicable rules of evidence.

Moreover, the contention of the defendants as to Joseph Futoran cannot stand because this witness was present in the courtroom throughout the entire proceedings, as they say and the testimony shows, and the plaintiff repeatedly offered Futoran without limitation for cross-examination of his prepared evidentiary documents.

The Futoran exhibits were not bare affidavits. Although the plaintiff had originally submitted a weaker edition of documents in the form of affidavits at the first hearing to vacate the temporary injunction, the documents presented subsequently at the preliminary hearing as exhibits were differently constituted. These latter were much more virile and informative, as substantiated and logical statistics.

The Futoran prepared documents here under attack are Exhibits GX100–108, inclusive and GX82. Exhibits GX100–105, inclusive, are re-statements by Futoran of the figures contained in Exhibits GX106–108, inclusive, *plus such other documents and financial statements given by the defendants to the plaintiff*. Exhibit GX82 is a re-statement of Futoran prepared Exhibits GX100–105, inclusive, *as modified by additional documents which were furnished by the defendants during the course of this trial*.

The Futoran affidavits presented at the first Thursday's hearing were based upon reports of underground face coal mining machinery and equipment manufacturers to the Bureau of Census and the Business Service and Defense Administration. Plaintiff's Exhibits GX100–105 and GX82 were based upon these which the defendants admitted in court were accurate, plus the defendants' own reports as offered to the plaintiff during the course of the trial.

Does the plaintiff's case then lack substance because it is based upon these and because Futoran was not physically placed on the stand so that the defendants could cross-examine him?

■ From the record as a whole, it does not appear that the defendants question the statistics of their source, but rather Futoran's calculations. From the record as a whole, the defendants cannot complain that they did not have the right to cross-examine Futoran on these statistical exhibits, because the defendants chose not to cross-examine him.

As for example, at page 120 of the transcript, this was said:

"Mr. Melchior: * * * Now, I will very gladly make available Mr. Futoran for interrogation on it during the hearing if the court wishes.

"The Court: In order to make the determination on a preliminary injunction, whether I issue it or don't issue it, I must make findings of fact, and I am not going to make findings of fact upon mere affidavits. I want something in the record."

At page 462 of the transcript, it is noted that the defendants desired that the plaintiff place the witness physically and formally on the stand before they would agree to cross-examine him. There are other places in the record which indicate that Futoran was available to the defendants for cross-examination.

■ At no time did the defendants indicate that they wished to have Futoran on the stand for cross-examination. It was obvious that they did not desire it. However, in spite of the fact that the defendants chose not to cross-examine him, I have examined each of the Futoran exhibits and found no difficulty in tracing the calculations to the federal reports and to the figures as submitted by the defendants. I find as a fact that Futoran neither colored nor varied the figures, but rather that he aided in making them more discernable for the pertinent purposes of this case.

■ While only the preliminary hearing has been had here, by necessarily

shortened procedure, the plaintiff's economic statistics were properly admissible since such statistics do not lack vitality as the defendants admit. In the Brown Shoe Co. case, supra, reliance was had upon the United States Bureau of Census figures, Notes 2, 4 and 6, and in 370 U.S. at page 322, in Note 38, 82 S.Ct. at page 1522, 8 L.Ed.2d 501, the Supreme Court said:

> "Subsequent to the adoption of the 1950 amendments, both the Federal Trade Commission and the courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case."

The Futoran exhibits were not considered alone, but in relation to all of the evidence of the case as a whole. These exhibits thus are not dead affidavits relating to unverified averments or assertions. They are factual and factually based and entitled to much weight.

While it is not really meaningful here, nevertheless, it should be stated that the defendants in their affidavits did not counter the Futoran documents so as to set up any question of fact. But it is meaningful that the defendants chose to contradict the Futoran affidavits by presenting their own economic expert as a witness, Mr. Jesse Friedman.

This witness testified that he had examined the plaintiff's exhibits and found them improperly based. He, himself, then prepared a statistical report which was offered in evidence as defendants' Exhibit No. "Y", which he said more nearly represented the true facts of the case. The witness, however, admitted that his source of information was for other than underground coal mining machinery and equipment, and he then concluded that the plaintiff's statistics also included other than coal mining machinery and equipment.

Thus, the defendants through this witness presented a question of fact for my determination. After examining the defendants' expert witness on the stand and scrutinizing defendants' Exhibit No. "Y" and defendants' Exhibit No. "Z", which he maintained was the Government's report that gave support to his statistical Exhibit No. "Y", and all of this in relation to the evidence as a whole, this witness and Exhibit No. "Y" convinced me that he and his Exhibit No. "Y" were entitled to little weight, if any, and particularly as against the basic, revealing and persuasive evidence of the plaintiff. I, therefore, resolved the question of fact in favor of the plaintiff that its statistical evidence was sufficiently substantial as relating to the subject of underground coal mining machinery and equipment.

The defendants' attack upon the plaintiff's case was also based upon the affidavits of Hugo C. Nyquist and J. D. A. Morrow [12] I have already stated that these were disregarded in arriving at a determination.

As appears, infra,[13] under the heading "Irreparable Injury", the defendants have strongly urged through their affidavits Nos. A, B, and C, that irreparable injury will result to the defendants if the preliminary injunction should issue. Further,[14] under the heading "The Coal Industry", through affidavits Nos. E and W, and numerous letters from coal producers the defendants sought to convince the Court that the coal mining industry would benefit from the proposed merger. These were introduced in evidence for the purpose of convincing me against the issuance of a preliminary injunction. These affidavits and letters were fully considered by me. This is merely noted here to show that the defendants are inconsistent when they, themselves, rely upon affidavits and letters to prove certain phases of their case while at the same time, they attack the plaintiff's ex-

12. See Notes 9 and 10.

13. Page 544 of this Opinion.

14. Page 553 of this Opinion.

hibits which have superior evidentiary value.

## JUSTIFICATION FOR PROCEDURE

The defendants in their brief at page 3 argue, "There is no justification for applying to merger cases a unique set of standards not applicable to any other anti-trust violations."

Section 15 of the Clayton Act [15] includes within its provisions the following:

"* * * and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited."

No one may deny that this is a mandate expressed by Congress in concise and indubitable words. Mr. Chief Justice Warren in the Brown Shoe case, supra, states, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency * * *". And just as Mr. Justice Clark in a separate concurring opinion adds 370 U.S. at page 355, 82 S.Ct. at pages 1541–1542, 8 L.Ed.2d 501, "To me § 7 is definite and clear.", so it may be said of § 15.

Since, then, the present action relates to a violation of § 7 of the Clayton Act, what are its requirements of the Attorney General and United States Attorney? [16] The gist of § 7 is a prohibition of any acquisition by a corporation, in whole or in part, of the stock, share of capital, assets or proxy rights of other corporations, which may substantially lessen competition or tend to create a monopoly; and the gist of § 15 is an order upon United States Attorneys under the direction of the Attorney General "to institute proceedings in equity to prevent and restrain such violations" of the prohibition contained in § 7.

The United States Attorneys and the Attorney General simply performed their duty in this case when they instituted this action. But if there be any doubt whatsoever about ulterior motivation to guide the United States Attorney and the Attorney General, reference to the history of the uncontrolled growth and development of corporate monopolies through acquisitions and mergers and of the apprehension of Congress and Presidents responsible for the welfare of the country lend significance to the seriousness of the Congressional language contained in § 7 and § 15. While in the Brown Shoe Co. case, supra, the Supreme Court considered mainly the finality and appealability phases of the Clayton Act in relation to that case, its recital of legislative history commencing 370 U.S. at page 311, 82 S.Ct. at page 1516, 8 L.Ed. 2d 501, revealingly delineates the various guide-lights which brought about the amendatory enactment so as to make § 7 more effective. It is just as meaningful to merely refer to this history and to adopt it by such reference as a part of this opinion as to recite it here verbatum.

See also the reference, made by Judge Willson of this Court in United States v. Koppers Company, Inc., 202 F.Supp. 436 commencing at page 439 (W.D.Pa., 1962), to Judge Weinfeld who in 1953 summarized the legislative history of the Clayton Act and the circumstances which led to its amendment in 1950 in United States v. Bethlehem Steel Corporation, 168 F. Supp. 576 (S.D.N.Y., 1958). We have authority then that the reports from both houses of Congress on the amendment which was eventually enacted into law on December 29, 1950, removes or eliminates the slightest doubt of the intention of Congress, In Senate Report No. 1775,

---

15. 15 U.S.C.A. § 18, 64 Stat. 1125.

16. Change of Name—Act of June 25, 1948, c. 646, § 1, 62 Stat. 909, 28 U.S.C.A § 501, effective September 1, 1948, substituted "United States Attorneys" for district attorneys of the United States.

81st Congress, U.S.Code Cong. & Adm. News 1950, p. 4294 2nd Session it was stated at page 2:

"The purpose of the proposed legislation is to prevent corporations from acquiring another corporation by means of the acquisition of its assets, where under the present law it is prohibited from acquiring the stock of said corporation."

And on page 3, excerpts are:

"The purpose of the proposed bill, H.R. 2734, is to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions."

"While there exist many differences of opinion on other aspects of the monopoly problem, there is substantial agreement that the level of economic concentration is extremely high."

"The enactment of the bill will limit further growth of monopoly and thereby aid in preserving small business as an important competitive factor in the American economy."

It is the defendants' argument that "if the courts adopt the contention of the Department of Justice, the granting of a preliminary injunction in merger cases will become virtually automatic and the effect on the business community will be severely adverse." [17] They maintain generally that employees, customers, suppliers, banks and stockholders "may become" unsettled or restive, and negotiations and plans for mergers be abandoned because of a preliminary injunction. They argue that a preliminary injunction in this case should not issue, and that the acquisition or merger be permitted, and that if subsequently the defendants were found by the Court to be in violation of § 7, that divestiture then could be ordered.

This contention files in the face of both the Congressional and the judicial interpretations. Referring once again to Senate Report No. 1775, at pages 4 and 5, it was stated:

"The intent here, as in other parts of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding."

Defendants' argument also disregards what our Supreme Court has declared in the DuPont & Co. case, supra, where Mr. Justice Brennan said,

366 U.S. at pages 328–329, 81 S.Ct. at page 1251, 6 L.Ed.2d 318:

"That statute is specific and 'narrowly directed,' Standard Oil Co. [of Cal. and Standard Stations] v. United States, 337 U.S. 293, 312 [69 S.Ct. 1051, 93 L.Ed. 1371] (1949), and it outlaws a particular form of economic control—stock acquisitions which tend to create a monopoly of any line of commerce."

366 U.S. at pages 325, 326, 81 S.Ct. at pages 1249–1250, 6 L.Ed.2d 318:

"But the primary focus of inquiry, as we shall show, is upon the question of the relief required effectively to eliminate the tendency of the acquisition condemned by § 7. For it will be remembered that the violation was not *actual* monopoly but only a *tendency* towards monopoly. The required relief therefore is a remedy which reasonably assures the elimination of that tendency."

366 U.S. at page 326, 81 S.Ct. at page 1250, 6 L.Ed.2d 318:

"The key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition. Courts are not authorized in civil proceedings to punish antitrust violators, and relief must not be punitive. But courts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."

---

17. Page 3 of Defendants' brief.

366 U.S. at page 327, 81 S.Ct. at pages 1250–1251, 6 L.Ed.2d 318:

> "Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences. This proposition is not novel; it is deeply rooted in antitrust law and has never been successfully challenged."

366 U.S. at page 332, 81 S.Ct. at page 1253, 6 L.Ed.2d 318:

> "What was said of the Sherman Act in United States v. Union Pacific R. Co., 226 U.S. 470, 477 [33 S.Ct. 162, 57 L.Ed. 306] (1913), applies here: 'So far as is consistent with this purpose a court of equity dealing with such combinations should conserve the property interested involved, but never in such wise as to sacrifice the object and purpose of the statute.'"

■■ It must be assumed that public officials act in good faith. There is no merit to the defendants' contention that the Department of Justice in proceeding for a temporary and preliminary injunctive remedy, applied "to merger cases a unique set of standards not applicable to any other antitrust violations".

I find it difficult to understand the defendants contention that this case be allowed to go to final hearing without injunction, and that if a violation of Sec. 7 has occurred that the remedy of divestiture then be effected. Considering the hardships of divestiture actions with their ramifications and complications and their painful impacts upon all whom they touch, it is hard to understand that such a device can be reasonably considered as the ultimate remedy to be employed here. Since substantial evidence is in the record which moves this Court to act, I have strong authority to do so at what is presently the incipient stage of a threatened violation of Sec. 7. It is as Mr. Chief Justice Warren says in Brown Shoe Co., supra, 370 U.S. at page 346, 82 S.Ct. at page 1535, 8 L.Ed.2d 501, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency * * *".

The plaintiff, employing information actually or indirectly supplied by the defendants, themselves, has given substantial evidence of the fact that such acquisitions as proposed by the defendant, Ingersoll-Rand, may substantially lessen competition and tend to create a monopoly. And as Mr. Justice Brennan said in United States v. DuPont & Co., supra, 366 U.S. at pages 325–326, 81 S.Ct. at pages 1249–1250, 6 L.Ed.2d 318, the Court must consider here that it is not that the violation is an actual monopoly, but only a tendency towards monopoly. While the defendants have argued about the hardships to the defendants and the potential defeat of the acquisition because of an injunction, it is, as the Supreme Court states, necessary for me to grant, at the present time, temporarily, the required relief as a remedy which will reasonably assure the prevention or elimination of that tendency. This is the meaning of Sec. 7 "Its essential purpose was preventative—to check anti-competitive acts in their incipiency before they reached the dimensions of the Sherman Act violations. In short, Congress contemplated a standard much less rigorous than that which had become required under the Sherman Act." United States v. Koppers Company, Inc., supra, 202 F.Supp. page 439.

The DuPont case and the Brown Shoe Co. case exemplify the difficulties and involvements which arise, when divestiture occurs, to corporations where acquisitions have absorbed other corporation interests. I am aware that, in the instant case, if acquisitions were permitted and divestiture eventually ordered, the difficulties involved would not be of the same magnitude or degree as in the DuPont and Brown Shoe Co. cases. This is particularly true because of the contrast in the time element existing in those cases and in the instant case.

Nevertheless, it is clear from the acquisition agreements and the defendants' evidence that (and this is said in spite of the fact that counsel for the defendants contend that the various companies were intended to be kept in more or less status quo) complete reconstruction has been planned in the proposed acquisitions by which Ingersoll-Rand will integrate the other three defendant companies. This may very easily be not only in violation of § 7 but of the Sherman Act.

One may seriously doubt that the parties, after years or after only a few months, will be able through divestiture to disintegrate so as to recreate or re-establish the status quo of all the companies and related matters as of the time of the granting of this preliminary injunction. For, no matter how well planned, and how carefully the composition of all its elements may be, the decomposition no matter how well and thoroughly executed, must invariably leave inevitable changes.

■ To permit the acquisitions, even temporarily as defendants insist, would undoubtedly result in the passing of records, trade secrets and other confidential matters into the possession and control of Ingersoll-Rand prior to the Court's final adjudication. So that it is not at all unlikely that a permitted acquisition now culminating in an eventual divestiture later will have left (even quite innocently) a residue with possible concomitant injury. These present examples of what Congress had in mind by the 1950 amendment of § 7. People of State of California v. Federal Power Commission, 369 U.S. 482, 489, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. DuPont & Co., supra. Displacement and dislocation of management personnel, assets and records of the acquired companies, together with all other matters which concern the preservation of competitive vigor should be delayed until a decision is rendered at a final hearing. The equities of the case require that none of the defendant companies be permitted to be acquired even in part, until the merits of this whole case are finally adjudicated.

There is also authority for this principle in Crane Company v. Briggs Manufacturing Company, 6 Cir., 280 F.2d 747 (1960), that after the merger the acquired company (Briggs) could not be revived as a rigorous competitor. The Court states 280 F.2d at page 750:

"Crane argues though that an order of divestiture following a decision for Briggs on the merits would effectively restore the corporations to their prior separate competitive positions. This argument ignores the practicalities of the matter and the effect that participation of Crane in the business affairs of Briggs may have on the financial position of the latter. By the time a decision is rendered in the principal action Crane may well have progressed to a point in its efforts to improve its own manufacturing and supply facilities by the acquisition of Briggs' facilities that a divestiture decree would be ineffective to repair the damage done to Briggs' employees and distributors. It may be doubtful that Briggs could reactivate itself as a vigorous competitive entity. It has been said that after the saber thrust, the wound is still there. The purpose of the injunction is to prevent the wound if it is at all possible to do so."

■ Whatever inconvenience the delay in consummating the proposed acquisitions may cause the defendants, the public interest in preserving a free-competitive economy cannot be outweighed by any private interest. In United States v. United Shoe Machinery Company, 227 F. 507, 510, 511 (E.D.Mo. 1915), reversed without prejudice upon abandonment by the Government of its claim for preliminary injunction, 8 Cir., 232 F. 1023 (1916), the Court rejected a claim of injury to the defendant and others:

"Even if this be true, the court should not hesitate to declare the

law, whatever the result to the defendants and their lessees may be. If the course adopted and practiced by the defendants has had the effect to stifle competition and create a monopoly, then the law should be enforced, even if it resulted in going back to the awl and wooden peg. The continuing of the business as heretofore practiced by the defendants and its lessees might and probably would further enrich them, but this would be done at the expense of the men, women, and children who, by reason of the monopoly, are forced to buy shoes from such lessees and manufacturers."

The ultimate legal issues involved in this action raise such serious and substantial questions as relate to the legality of the defendants' contemplated action as to require that consummation be, at least, postponed until final hearing. Failure to halt consummation of these mergers now may defeat the purpose embodied in § 7.

### IRREPARABLE INJURY

The defendants have interposed the double objection (1) that the plaintiff has failed to show any irreparable injury in order to entitle it to a preliminary injunctive order, and (2) that conversely the defendants will suffer much injury because the issuance of a preliminary injunction threatens (a) Galis with critical financial difficulties, (b) Goodman with potential loss of establishment of plants in India and Australia, (c) Lee-Norse with competitive exploitation, and (d) all the defendants with possible frustration of consummation of the agreements' for acquisitions, before a final determination can be had.

*Plaintiff's Injury*

 As relates to the lack of showing by the plaintiff of irreparable injury, it would appear from the history of mergers and the efforts by the Government to limit them or to neutralize certain destructive effects to the nation's economy that an impressive showing has been made by the plaintiff of irreparable harm which may or can follow the consummation of these contemplated acquisitions.

Report No. 1191 of the House of Representatives, accompanying the proposed amendment states:

At page 2:

" * * * The long-term trend of concentration has been steadily upward."

"This long-term rise in concentration is due in considerable part to the external expansion of business through mergers, acquisitions and consolidations."

At page 3:

"That the current merger movement has had a significant effect on the economy is clearly revealed by the fact that the asset value of the companies which have disappeared through mergers amounts to 5.2 billion dollars, or no less than 5.5 percent of the total assets of all manufacturing corporations—a significant segment of the economy to be swallowed up in such a short period of time."

" * * * the outstanding characteristic of the merger movement has been that of large corporations buying out small companies, rather than smaller companies combining together in order to compete more effectively with their larger rivals."

"Such in general outline is the broad economic problem of high and increasing concentration with which this legislation is concerned."

 The enactment into law of the proposed amendment was an expression of the public policy of the nation, and the threatened violation of the law here is itself sufficient public injury to justify the requested relief. The Congressional pronouncement in § 7 embodies the irreparable injury of violations of its provisions. No further showing need be made by those directed to enforce that section than that it is being violated or threatened with viola-

tion. Nor is it necessary to demonstrate the precise manner in which violation of the law will result in injury to the public interest. It is sufficient to show only that an act or threatened act is within the declared prohibition or Congress. The test which the Government must meet in a preliminary injunction proceeding in this question was stated in the preliminary injunction hearing in United States v. Brown Shoe Company case, cited in Trade Cases Par. 68,244 (E.D.Mo., 1956) at pages 61, 114, 115:

"* * * in a case under Section 7 where the Government is party plaintiff, if by acquiring stock by one corporation in another corporation, in any line of inter-state commerce, in any section of the country, the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly plaintiff would not have to show hardship to any segment of the public. It is patent on the face of Section 7 that its purpose is to bar mergers which tend to lessen competition or tend to create a monopoly before they ripen into actuality. Consequently hardship or injury to the public is not and cannot be a part of the Government's burden."

"Applying the law of the Hamilton Watch case (Hamilton Watch Co. v. Benrus Watch Co., D.C., 114 F. Supp. 307], with exception noted, do the affidavits, pleadings and statutes present a record that raises questions so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and to call for more deliberate investigation as to the merits of the charge that the proposed merger in its effect may be, in a line of commerce in a section of the country, substantially to lessen competition or tend to create a monopoly?"

When the Government acts to enforce a statute or make effective a declared policy of Congress, the standard of the public interest and not the requirements of private litigation measure the propriety and need for injunctive relief. United States v. Shafer, 132 F.Supp. 659 (D.C.D.Md.1955); affirmed 4 Cir., 229 F.2d 124 (1956), cert. denied 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956).

*Defendants' Injury.*

Nevertheless, substantial consideration was given to the anticipated and threatened plight as declared by the defendants.

The evidence introduced by the defendants reveals that Galis began business in 1948 with the sum of $700.00 borrowed capital, and approximately 6 employees. Since 1948, Galis expanded rapidly, incorporated, and in 1961 purchased facilities and assets from Fairmount Machinery Company for $1,200,000 without any cash outlay. In the same year, the employment rose to 500 persons and the business to 4 million dollars. Galis complained at the hearing that it was confronted with the payment of income tax for 1962 in the sum of $75,000 and of the sum of $129,000 on account of its indebtedness to Fairmount Machinery Company. It had no money to pay these amounts, and unless the merger was permitted, it faced financial embarrassment. It admitted through its counsel that it had made no efforts at any time to anticipate payment of these amounts by borrowing. It had looked only to the financial aid it was to receive through the Ingersoll-Rand acquisition. This was presented to the Court through the statement of Galis' counsel and by means of an affidavit.[18] This affidavit was accepted in evidence, but this evidence does not persuade that the Galis position is as it would have this Court believe.

The information presented in evidence is meager and non-informative. There is evidence in the record from defendants' source that Galis received royalty income from patents amounting to $40,000 to $80,000 annually. There is evidence of the 4 million dollar busi-

18. Defendants' Exhibit A.

ness done. There is no explanation of what the gross or net profits were for the year 1962, nor any provisions made since 1961 for scheduling payment on the Fairmount obligation, nor for income tax payments. There is no information on the dividends paid or unpaid, and similar other related but important information so as to better inform this Court as to the possible financial embarrassment facing Galis.

I am left unimpressed by the evidence that the issuance of a preliminary injunction should be withheld in this case because of irreparable injury to Galis.

Defendant, Goodman, presented an affidavit [19] for the purpose of showing irreparable injury to it if a preliminary injunction were to issue. I accepted this affidavit as evidence and considered it, together with all the evidence in the case.

In summary, the Goodman affidavit concludes that a delay at this time of the closing of the acquisitional agreements will result in the "loss of a large part of the current year's business and future business as well". In addition, Goodman complains that it stands to lose the business recently quoted on orders amounting to $2,464,000 for the sale of rope belt conveyors in India, and for the establishment of a plant in India to manufacture equipment. It complains also that the same condition as prevails in India prevails in Australia, and that Goodman stands to lose in this area. It adds that it has made a large outlay in carrying out the Ingersoll-Rand negotiations which will result in a deterioration of morale and inefficiency in operations and will adversely affect the employees of Goodman and corresponding benefit to the public interest, if enjoined here.

It is obvious then that Goodman has permitted itself to be acquired by Ingersoll-Rand so that it could further its corporate position in establishing factories in India and Australia. But from the other evidence, it is shown that Ingersoll-Rand will have acquired the Goodman corporation. All that Goodman complains of here is its own activities as they affect itself. There is no indication that it gave any consideration to the Congressional concern and that it examined its own activities before it moved into its present direction. I see in this operation the normal activities which business undertakes, with the usual risk of failures and accomplishments. In any event, since the defendants have testified to the high quality of their products and their endeavors, it would seem that a delay would not unduly prejudice them in their progressive strides. I cannot consider the Goodman position as prejudiced here, when it is weighed against potential public injury which may result if a forbidden acquisition is to be permitted.

In the evidence at the hearing of this case, the defendant Lee-Norse, presented an affidavit [20] of its President, E. M. Arentzen. Lee-Norse complained that it would suffer irreparable injury if the preliminary injunction were to issue because additional capital was needed for expanding its business, and because a delay in the closing of the transaction would permit other manufacturers to "exploit" any announcement of a postponement of the closing by seeking to divert orders from the company, and because it stands to lose a number of key employees who may seek employment elsewhere. An examination of the Lee-Norse financial report [21] does not bear out the expressed apprehension of Lee-Norse. Nor does its other complaints have any merit.

As for the defendants' fear that a preliminary injunction may defeat the consummation of the agreements for acquisition before a final determination can be had, the answer is primarily that the defendants have shown no evidence that the consummation, if legally proper, can be frustrated before the final hearing. But even this argument cannot de-

19. Defendants' Exhibit C.
20. Defendants' Exhibit B.
21. Plaintiff's Exhibit GX42.

feat a Congressional mandate, where as here, the plaintiff moves to make effective a declared policy of Congress. The status of public interest and not the requirements of private litigation measure the propriety and need for relief. United States v. Shafer, supra.

It appears, then, that if the acquisitions are to be permitted after a final hearing, the only real loss which may be suffered by the parties is that of delay.

## BASIC ISSUES

The three basic issues in a Clayton Act Section 7 proceeding are (1) the lines of commerce, (2) the sections of the country, and (3) the probable competitive impact of the mergers.

## LINE OF COMMERCE

In a trial on the merits, the Government must establish by a preponderance of the evidence that competition may be substantially lessened in any line of commerce in any section of the country " * * * whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." Senate Report No. 1775, 81st Cong.2nd Sess., p. 5.

And as the Supreme Court stated in George Van Camp & Sons Company v. American Can Company, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311 (1929), and reiterated in United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 594, n. 13, 77 S.Ct. 872, 878, 1 L.Ed.2d 1057 (1957):

"* * * if the forbidden effect or tendency is produced in one out of all the various lines of commerce, the words 'in any line of commerce' literally are satisfied."

The plaintiff's burden here is merely to show that the product lines involved may ultimately be found to be lines of commerce. On the record for a preliminary injunction under the line of commerce criteria set forth in the Brown Shoe Co. case, supra, the plaintiff has already met the test for a trial on the merits in spite of the fact that such a quantum of proof is not necessary at this stage. A preliminary injunction must issue if the plaintiff has raised serious and substantial questions on the relevant line of commerce.

In the Aluminum Co. of America case, supra, the Court said:

"Defendants further argue in this connection that because there is great dispute between the parties on the 'line of commerce' and the area of 'effective competition', such a dispute precludes a preliminary injunction.

"We are of the opinion that while disputed facts and law as to the ultimate issue will be considered by the court on a Motion for Preliminary Injunction the fact that there are disputed facts and law does not in itself prevent issuance of a preliminary injunction."

The Court added:

"On the record before this court, the plaintiff has raised serious and substantial questions on the 'line of commerce' in the vertical aspects of the merger where the probable future effect may be substantially to lessen competition or tend to create a monopoly. These are complex questions which require future and more deliberative study after a full presentation of facts but at this time juncture it is clear to this court that a preliminary injunction should issue to protect this court's ability to decree effective relief should this merger be proscribed."

Bituminous coal is a major source of energy used by American industry and homeowners. In the year 1961 more than 402,000,000 tons of bituminous coal was mined having a value of over one and three-quarter billion dollars ($1,750,000,000). As an indication of the importance of bituminous coal to United States industry, over three-fourths of this production was consumed by industrial users.

Bituminous coal is mined both by underground and strip (surface) mining processes, underground mining account-

ing for substantially more than 50% of the total production.

Since the close of World War II, underground bituminous coal mining has been revolutionized by the introduction and increased use of large expensive extractive machinery, which, in many mines, has resulted in the reduction of the cost of mining a ton of coal per man hour. Coal mining companies expect this reduced cost factor to enable coal to become more competitive with substitute fuels which have in recent years gained wide acceptance.

Several distinct categories of coal mining machinery and equipment are generally recognized. These categories include (1) the continuous miner, (2) face coal mining machinery and equipment, and (3) underground coal mining machinery and equipment. Face coal mining machinery and equipment includes continuous miners. Underground machinery and equipment includes both of the other two categories.

*The Continuous Miner*

The continuous miner, first introduced to underground coal mines in 1948, has experienced wide and rapid acceptance by the industry since that date. Whereas, in 1948 only one-tenth of one percent (0.1%) of the United States production of bituminous coal was mined by the use of continuous miners, only thirteen years later over thirty percent (30%) of the nation's total production of bituminous coal as mined by continuous miners. In terms of tonnage, this represented an increase from 450,000 tons in 1948 to 84 million tons in 1961.

The function performed by the continuous miner is to rip the coal from the face of the mine and simultaneously to load it on a conveyor belt or into shuttle cars for delivery to the mouth of the mine. Continuous miners are of the borer, ripper and milling types and are designed for high, intermediate and low seams, and while a particular type may be most adaptable for a particular type and grade of coal seam, the several types are often used interchangeably. In ad-

dition, a particular customer will often purchase several types, even for the same mine. The continuous miner performs all of the underground mining functions performed by the several types of conventional face mining equipment, i. e. cutting, drilling, blasting and loading. The price of continuous miners, depending upon the particular type, is upwards of $85,000 and may run as high as $250,000.

Continuous miners are subject to hard usage and rough treatment. Such usage results in considerable wear and tear, and there is a pressing need for frequent maintenance and replacement of parts in order to keep them in condition for daily operation. With the installation of a Lee-Norse miner, the customer usually purchases a stock of replacement parts to be kept close to the mine for emergency repair. This initial stock of parts may range from 20% to as high as 50% of the price of the machine. For example, during the year ended September 30, 1961 sales of replacement parts for the Lee-Norse miner accounted for approximately 39% of the company's total sales.

Continuous miners are manufactured and sold in the United States by only six companies. These companies include two of the defendants, Lee-Norse and Goodman, as well as Joy Manufacturing Company, Jeffrey Manufacturing Company, National Mine Service Company and Wilcox Company.

The Lee-Norse miner is operated by one man, and the machine may weigh from 50,000 to 68,000 pounds. The cutting device of the miner consists of four large rotating cutters which remove the coal from the seam and deposit it on the mine floor. As the cutting head moves along, dual gathering arms scoop the coal up through the center of the machine where a belt conveyor carries the coal to the mine's haulage system. The Lee-Norse continuous miner is produced in several sizes suitable for mining coal seams from 40 to 120 inches in height, and has a rated capacity of at least four tons of coal per minute.

The Goodman continuous coal miner extracts coal from the solid face without blasting and delivers the coal to the rear of the machine. Goodman has developed a form of belt conveyor which follows the continuous miner and carries the coal away to the mine's transportation system. Goodman's continuous miners are produced in several sizes for varying seams of coal.

Wilcox manufactures a continuous miner used in low seam coal mines of approximately 24 to 48 inches. This machine sells for approximatey $60,000.

Joy Manufacturing produces continuous miners of both the borer and ripper type and for low, medium and high seams.

*Face Coal Mining Machinery and Equipment*

The term "face coal mining machinery and equipment" is used in the industry to denote the entire complex of equipment used to extract coal from the face of the mine. This term includes continuous miners in addition to the conventional face mining machinery and equipment which the continuous miner has in many instances supplanted, namely, drills, cutters and loaders.

The mining of coal through the use of conventional face coal mining machinery is performed in the following manner: A number of holes are drilled into the face of the mine. Next, a border called a "kerf" is cut on the side and at the bottom of the face. Explosives are placed into the holes and detonated. The coal falls to the ground rather than exploding outward due to the prior cutting of the kerf. Finally, the coal is gathered by the sweeping arms of a loading machine and placed onto belt conveyors or shuttle cars to be taken away from the face of the mine. Roof drills and bolts are used to support the roof of the mine after the coal has been cut away. As indicated earlier, the continuous miner is designed to perform in combination all those tasks performed individually by conventional face machinery and equipment.

Companies engaged in the manufacture and sale of face coal mining machinery and equipment are the six continuous miner manufacturing companies and several others, including defendant Galis, one of the nation's largest manufacturers of roof and face drills.

*Underground Coal Mining Machinery and Equipment.*

"Underground coal mining machinery and equipment" is the broadest product category recognized by the industry in the underground mining of coal. Included in this category are all of the machinery embraced by "face coal mining machinery" and, in addition, a variety of haulage and supply machinery and equipment.

Haulage machinery and equipment is utilized to take the coal away from the face of the mine to a central loading point through the use of belt conveyors or shuttle cars. Then it is carried by mining cars pulled by mine locomotives to an area from which the cars can be hauled above ground. Alternatively, the coal is dumped from mining cars into "hoppers" and pulled above the ground.

Underground coal mining machinery and equipment is manufactured by all the companies previously mentioned in connection with continuous miners and face mining equipment plus those manufacturers engaged in the production of haulage and supply machinery and equipment.

Chief Justice Warren's opinion on the landmark Brown Shoe case, supra, 370 U.S. at page 325, 82 S.Ct. at pages 1253–1254, 8 L.Ed.2d 501, sets forth the criteria for the guidance of the courts in determining lines of commerce after completion of a trial on the merits. The case also serves as an excellent beacon for consideration of the issuance of a preliminary injunction.

The opinion contemplates both broad and narrow product lines. Thus, with respect to lines of commerce, the Court stated:

"The outer boundaries of a product market are determined by the rea-

sonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593–598 [77 S.Ct. 872, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce' * * *, it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed."

Judge Weinfeld, in the first decision in a Government Section 7 proceeding and cited with favor by the Supreme Court, also found that the line of commerce concept comprehended narrow lines of commerce within broader lines. Thus, in finding as a line of commerce the broad iron and steel industry line of commerce, the Court said:

"Upon all the evidence the Court finds that the following are the appropriate lines of commerce: (1) the iron and steel industry as a whole; (2) hot rolled sheets; (3) cold rolled sheets; (4) hot rolled bars; (5) track spikes; (6) tin plate; (7) buttweld pipe; (8) electricweld pipe; (9) seamless pipe; (10) oil field equipment and (11) oil field equipment and supplies.

"It is not necessary to analyze separately and in detail each line of commerce as found by the Court, since a merger violates section 7 if the proscribed effect occurs in any line of commerce 'whether or not that line of commerce is a large part of the business of any of the corporations involved' or 'where the specified effect may appear on (an) * * * industry-wide scale. The purpose of (section 7) is to protect competition in each line of commerce in each section of the country." United States v. Bethlehem Steel, supra, 168 F.Supp. at p. 595.

 There is sufficient evidence in the record indicating the lines of commerce of the subject matter for which a preliminary injunction was issued as relates to continuous miners and particular categories of continuous miners as borer and ripper types, and as relates to face mining machinery and equipment, and as it relates also to underground coal mining machinery and equipment as broader lines.

## SECTION OF THE COUNTRY

 Since the evidence is clear that all competitors sell machinery and equipment throughout the country wherever coal is mined underground, the entire United States as a whole is the relevant section of the country involved in this proceeding.

## PROBABLE IMPACT OF THE PROPOSED ACQUISITIONS

The acquisitions by Ingersoll-Rand, as provided in the various contracts, contemplate placing under unified control companies accounting for a substantial share of total industry output in three significant categories. In addition, a number of additional specific probabilities of lessening of competition may result.

Ingersoll-Rand is a large, well-financed, diversified manufacturer of industrial machinery. Goodman, Lee-Norse and Galis are manufacturers of a variety of face and underground coal mining

machinery and equipment. A merged company of all these may present an economic impact.

In the broadest relevant product market, underground coal mining machinery and equipment (third category), Ingersoll-Rand would, by the agreements intended, acquire three companies which together account for about thirty percent of the total industry sales. This significance may become acute where because of the relatively small number of companies in each of the product lines involved, an already narrow field becomes more narrowly confined and more prone to monopoly. Eliminating smaller corporations may quite understandably be frustrating the Congressional design.

The defendants maintain that there has been no showing by the plaintiff of competition between two companies to be acquired by Ingersoll-Rand. The House of Representatives Report No. 1191, supra, at page 11 states:

"* * * the bill, applies to all types of mergers and acquisitions, vertical and conglomerate as well as horizontal, which have the specified effects of substantially lessening competition * * * or tending to create a monopoly."

At page 7 it states:

"* * * the Supreme Court and the Federal courts have not applied the present strict language of section 7, even in cases of stock acquisition, so as to prevent a small corporation from selling its business or of merging with another small business."

And at page 3:

"* * * the outstanding characteristic of the merger movement has been that of large corporations buying out small companies, rather than smaller companies combining together in order to compete more effectively with their larger rivals."

Two of the smaller defendant companies account for sixty percent of the total industry sales of continuous miners (first category) in a field of only six manufacturers. Three of the companies account for about forty percent of the total industry sales in face coal mining machinery and equipment (second category), where there are only ten primary manufacturers now.

The Supreme Court in the Brown Shoe Co. case, supra, 370 U.S. at page 343, n. 71, 82 S.Ct. at page 1534, 8 L.Ed.2d 501, cited with approval an article in which appeared the following statement on the probable adverse effect of the elimination of a substantial competitor by merger:

"The loss of a substantial firm, however, may of itself induce a reduction in the vigor of competition. Even if new entrants are coming into the market or concentration is for some other reason declining, there will be one less substantial firm than would have existed but for the merger, and an adverse finding under Section 7 is predicated on the presumption that competition would have benefitted had that firm remained independent. Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L.Rev. 226, 327 (1960)."

The probability of eliminating competition and the tendency to create a monopoly must be considered as to all matters raised by both the plaintiff and the defendants and as it relates to costs for research and development, for the need of financial support and for the inclination of modern marketing to combined financing, production and sales.

As Judge Pope commented in the Crown Zellerbach Corporation v. Federal Trade Commission, 9 Cir., 296 F.2d 800, 825 (1961):

"As the legislation was under consideration by Congress it was duly appreciated that decentralized and deconcentrated markets are often uneconomic and provide higher costs and prices. All this is laid aside in its concern over the 'curse of bigness' and the concentration of power in the nation's markets which Con-

gress thought advantaged the big man and disadvantaged the little one."

 Acquisitions may contravene the provisions of Section 7 if they result in the creation of relationships between the resulting company and its customers and suppliers which may bring about competitive advantages to the merging companies detrimental to competition.

The Congress anticipated this possibility by stating:

" * * * The bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize. Such an effect may arise in various ways: * * * establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete. H.Rep.No.1191, supra, at p. 8."

The prospectus of Lee-Norse disclosed a probable relationship of such a nature in this situation. For example, Consolidation Coal Company, one of the nation's largest coal producers, has an option to purchase 8,100 shares of stock owned by Alex Galis, President of Galis.[20] In addition, Consolidation Coal owns 120,000 shares, or 21%, of the 439,056 outstanding shares of common stock of Lee-Norse Company.[21]

 Ingersoll-Rand's position as the fourth largest general industrial machinery manufacturers requires it to purchase large quantities of steel, and its purchases are important to the steel companies. The steel industry, on the other hand, constitutes one of the largest markets for coal today. It is not overly speculative to assume that the judicious use of its steel-purchasing power by Ingersoll-Rand could immeasurably increase the sales by the acquired companies of machinery and equipment to the coal mining companies which acutely need the continued goodwill of the steel industry. Moreover, the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantages in securing the goodwill of the possessor. Certainly the steel producer who seeks orders from Ingersoll-Rand may tend to prefer the acquired companies as the source of supply of equipment used in his "captive" mines, and the advantages accruing to him from so favoring the acquired companies would not have to be pointed out by Ingersoll-Rand. What may here be involved is the trade practice known as "Reciprocity". This is particularly destructive of competition because it transforms substantial buying power into a weapon for "denying competitors less favorably situated access to the market." United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1949). It distorts the focus of the purchaser by interposing between him and the traditional standards of price, quality and service, an irrelevant and alien factor which is destructive of fair and free competition on the basis of merit. The competitor may thereby suffer loss because of a circumstance not bearing directly on the worth of his product. In this situation, it is the relative size and conglomeration of business rivals, rather than their competitive ability, that may determine success. Obviously, this practice strikes at one of the basic premises of a free enterprise economy. Therefore, a merger which would result in its extension should be closely scrutinized. Consolidated Foods, Inc. FTC Docket No. 7000, Trade Reg. Rep. FTC Complaints, Orders, Stipulations, Par. 16,182 at 20,962 (1962).

20. Exhibit GX12.

21. Exhibit GX42, p. 10.

## THE COAL INDUSTRY

The defendants contend, also that the proposed acquisitions do not violate Section 7 because the coal mining companies, until recently suffering from a declining demand for coal, will welcome entry of a large machinery company which will offer them the advantages of easier credit, leasing arrangements, greater resources for research and development, and the other "advantage" concommitant with great size.

 However, "benefit to the coal operators" cannot be the standard for determining Section 7 legality in this proceeding, where the alleged probable illegal impact is in the field of underground coal mining machinery and equipment manufacturers. This is necessarily so, since such a standard may not prevent a forbidden union of the manufacturers of coal mining machinery and equipment.

Assuming, arguendo, that some temporary benefit will accrue to the coal mining companies from these acquisitions, nonetheless the benefits of dominance in one area of the economy do not immunize a merger or acquisition where its effects "may be to substantially lessen competition or tend to create a monopoly in any line of commerce in any section of the country." Crown Zellerbach v. Federal Trade Commission, supra.

Section 7 is aimed against the reasonably probable lessening of competition as a result of a merger, and to now allow that the alleged benefits of anticompetitive conduct must immunize the offender from violation of the antitrust laws, would, indeed, be incongruous.

In this connection, the Court said in the Crown Zellerbach Case, supra, 296 F.2d at page 825:

> "When a large company increases its size, it has an opportunity to lower its costs of operation (and) * * * accomplish other economies: in purchases, in setting up research and legal staffs, and in increasing its advertising and promo-tion budgets. Such growth may well result in enabling it to offer its goods at lower prices. That might well be a positive benefit to ultimate consumers.

> "It is plain however from the Act and its legislative history that concern with such considerations was no part of the Congressional thought. Congress was not concerned about increased efficiency; it was concerned about the competitor,—the small business man whose 'little, independent units are gobbled up by bigger ones,' and about other competitors whose opportunities to meet the prices of the larger concern and hence compete with it might be diminished by a merger which increased the concentration of power in the large organization."

Similarly, this argument was considered and rejected by Judge Weinfeld in the United States v. Bethlehem Steel case, supra, 168 F.Supp. at pages 617–618:

> "The antitrust laws articulate the policy formulated by Congress. The significance and objectives of the Clayton Act and the 1950 amendment are well documented. In approving the policy embodied in these acts, Congress rejected the alleged advantages of size in favor of the preservation of a competitive system. The consideration to be accorded to benefits of one kind or another in one section or another of the country which may flow from a merger involving a substantial lessening of competition is a matter properly to be urged upon Congress. It is outside the province of the Court. The simple test under section 7 is whether or not the merger may substantially lessen competition 'in any line of commerce in any section of the country'.

> "Any alleged benefit to the steel consumer in the Chicago district because of reduced freight charges and an increased supply, cannot, under the law, be bought at the expense

of other consumers of numerous other steel products where the effects of the merger violate the Act. * * * "

█ From a preliminary view, it would seem clear that the economies of scale (volume purchasing and volume production) which may be effected by Ingersoll-Rand after the proposed acquisition potentially could place the remaining sellers of continuous miners, face coal mining machinery and equipment and underground coal mining machinery and equipment at a distinct competitive disadvantage. The continued existence of these smaller companies, some only a fraction of the size of Ingersoll-Rand, could be seriously threatened unless they too can achieve the economies of large scale operation. In order to achieve these operating economies, these smaller companies may also be forced to merge among themselves as a defensive measure, thus further increasing the degree of economic concentration in an already highly concentrated industry.

It is to prevent this escalation of industrial power in the hands of but a few companies, that Congress chose to reject the "benefits of dominance" argument as a defense to a violation of Section 7. A green light for these acquisitions may be particularly unfortunate at this time in the coal mining machinery industry, if as defendants' own experts predict, substantial growth in the coal machinery market is expected during the next decade.

## CONCLUSION

It is true that the plaintiff here bases its case in large part upon economic data received in evidence both oral and documentary. But this was sufficient taken with all the evidence as a whole, in the light of the law, to convince me that the status quo of the parties should be maintained until a final hearing. The plaintiff could not have procured the actual records of the defendants in presentable evidentiary form for a preliminary hearing in such short time. Nor

could the economic market in this field of production have been revealed in as short a time by the overwhelming abundance of evidence which undoubtedly exists and could have been produced as source information. It is an accepted fact that our Government has through its various agencies established reliability and trustworthiness for its public statistical records and reports. This is not denied by the defendants.

The evidence here includes the acquisition contracts, United States public records, defendants' reports and documents, and oral testimony.

I have not accepted any of this evidence as finalizing the complaint as presented. In order to make a final determination a trial of much longer duration must inevitably follow where company records and much testimony will probably be presented more leisurely and detailedly, and where the equities may be presented and examined in the light of such evidence as is presented. The granting of this temporary injunction does not determine the rights of the parties, but it does accomplish that for which it was intended, i.e. to provide time and opportunity to examine the proposed acquisitions in the light of reason and public policy.

If, as the defendants insist, these acquisitions are necessary and beneficial to the nation's economy, surely this examination must lend support and victory to their cause; but, if to the contrary, the examination reveals the acquisitions to be neither necessary nor beneficial to the nation because they tend to destroy its economy, the defendants can have no rights to consummate such acquisitions.

No one will doubt that the defendants desire a wholesome national economy, for by their contemplated acquisitions they express their confidence and belief in our nation and its economy. It is only that their opinions may clash with that of the Congress. I do not doubt the good faith of the defendants at this time. I doubt, presently, their judgment.

After an examination of all the evidence in this case as a whole, I believe, as of now, that the effect of the proposed acquisitions may be substantially to lessen competition, or to tend to create a monopoly. A preliminary injunction accordingly was issued to halt such acquisitions until the defendants have filed their answers and a final hearing has been had.

### SUPPLEMENTAL OPINION

After a preliminary injunction had issued on March 6, 1963 against the defendants to prevent their consummating the acquisitional agreements which form the subject matter of this action, a motion was presented by the defendants and argued on March 11, 1963 for modification of this injunctive order. This was denied on March 13th.

Defendant Ingersoll-Rand asked to be permitted to acquire as a purchaser, one or two of the three companies, namely, Goodman, Lee-Norse and Galis *pendente lite*. It is clearly set out in the transcript of March 11th starting at page 11:

"The Court: Is this now the ultimate or is this merely a step in the direction which you had intended or projected?

"Mr. Burns: This is one—

"The Court: By the original agreement?

"Mr. Burns: This is one of the steps along the way. Then the second part of the motion is that if the Court agrees to allow us to acquire either Goodman or Lee-Norse, then a second step is whether the Court would also allow us to acquire Galis, which there was no showing they were in competition with the other two. We want to ask for two things at one time. The first hurdle is whether we can have either Lee-Norse or Goodman.

"The Court: Without Galis?

"Mr. Burns: Without Galis, Now, if the Court decides that one in our favor, there comes the second question. Maybe the Department's views on that would not be as strong as they are on the first two. We'd like to keep them separate.

"The Court: Then you are asking for a modification to the extension that you may acquire either Goodman or Lee-Norse?

"Mr. Burns: Lee-Norse, right.

"The Court: But not necessarily.

"Mr. Burns: Not necessarily Galis, no.

"The Court: But in any event you would like, in addition if at all possible, the last mentioned company?

"Mr. Burns: Yes.

"The Court: Now, does this then mean that you will eventually wish to acquire any of the other two companies?

"Mr. Burns: We would like to have that determined by the Court of Appeals because our contention is—

"The Court: By the Court of Appeals?

"Mr. Burns: Yes.

"The Court: You would not want this Court to now make a determination on one alone?

"Mr. Burns: Well, we want the Court to make determination.

"The Court: And be bound by it?

"Mr. Burns: No, this would only be pendente lite. We are not asking the Court to review anything except to hold the door open.

"The Court: An interim request?

"Mr. Burns: That's right, and the Government can still oppose the whole case at a final hearing?

"The Court: I appreciate that, but I am talking about you, yourself. You do not intend to be bound by an order that will permit the acquisition of only one?

"Mr. Burns: No, Your Honor."

The defendants frankly state their position. The present merging of either Goodman or Lee-Norse with or without Galis is not the defendants' final contemplated purpose. This is but one step desired towards the fulfillment of the acquisition of all three companies. Defendant, Ingersoll-Rand, desires now to begin that acquisition while it furthers this existing litigation. Without saying so, it renews its previous urging, that if acquisition is, at the final hearing, determined to be in violation of Section 7, that divestiture be employed as the eventual effective remedy.

Here is a straightforward assertion that the defendants will be satisfied only with the acquisition package as a whole. But this is the plan. Ingersoll-Rand has available money for investment. It believes that the coal industry has a promising future and that its production vehicle must be by continuous mining equipment. It is evidently proceeding in the contemplated package acquisition, according to the plan as suggested in its Wearly Report [1]. Its goal is not to slowly develop a production project of coal mining equipment, but rather to emerge one which is full-bodied and fully going. It plans to accomplish this by ingesting two stalwarts and a robust producer in the closely related area. Acquisition of any of these, less three, does not fulfill the plan.

As of now the record points to the acquisition of the three companies as being in violation of Section 7 in that it may substantially lessen competition or tend to create a monopoly. But this must ultimately be determined by full and final hearing; and if it is finally determined to be in violation of the Clayton Act, a modified order, as of this time, allowing a single step towards consummation of the package plan will have been offensive in law and in equity.

As to the matter of permitting acquisition subject to divestiture correction, any of the parts of the package presents the same problem only in a lesser degree. I re-affirm here for any of its parts, what I said in the opinion about possible divestiture of the whole acquisition package.

Because the defendants desire a modification of the injunction order to start putting into effect the merger, which must first be finally, legally adjudicated, I deem it to be at the present time, a premature action, and therefore have denied the defendants' motion for modification of the preliminary injunction.