**UNITED STATES of America**

v.

**INGERSOLL-RAND COMPANY, Goodman Manufacturing Company, Lee-Norse Company and Galis Electric and Machine Company, Appellants.**

No. 14405.

United States Court of Appeals Third Circuit.

Argued April 22, 1963.

Decided June 5, 1963.

As Amended Oct. 29, 1963.

**510**

Joseph W. Burns, New York City, for Ingersoll-Rand Co.

Lionel Kestenbaum, Dept. of Justice, Washington, D. C., for appellee.

Before BIGGS, Chief Judge, and HASTIE and GANEY, Circuit Judges.

BIGGS, Chief Judge.

On March 6, 1963, in a suit filed by the United States against the defendants based on Section 7 of the Clayton Act, 15 U.S.C.A. § 18, the court below entered an interlocutory injunction to prevent the defendants from carrying out agreements contemplating corporate acquisitions by Ingersoll-Rand of companies engaged in manufacturing underground coal mining machinery in the United States. The basis for the issuance of the interlocutory injunction was "that the effect of the proposed acquisitions may be substantially to lessen competition, or to tend to create a monopoly." [1] The order issuing the interlocutory injunction is the subject of the appeal at bar.

1. United States v. Ingersoll-Rand Co., D.C., 218 F.Supp. 530 (W.D.Pa.1963).

## I.

We are faced *in limine* with the question as to whether the interlocutory order at bar is an appealable order under 28 U.S.C.A. § 1292(a) (1) (1962 Supp.). That Section provides, in pertinent part: "Interlocutory decisions. (a) The courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States * * * or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, *except where a direct review may be had in the Supreme Court* * * *."* (Emphasis added.)[2] The italicized phrase, "[E]xcept where a direct review may be had in the Supreme Court" may tell us all or may tell us nothing. But whatever its terms may be, they must be considered.

It is clear that a *final* order of a district court in a case under the antitrust laws is appealable directly and only to the Supreme Court. Section 2 of the Expediting Act of 1903, 15 U.S.C.A. § 29, now provides: "In every civil action brought in any district court of the United States under any of said [Antitrust] Acts, wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court."[3]

The road of appeal, had the order of the court below of March 6, 1963, been a final order and not interlocutory in its nature, would therefore be clearly marked, broad and open, and would lead directly to the Supreme Court of the United States. But, as the United States candidly points out in the opening sentences of its brief on this point in favor of a contrary view, "It is a commonplace of antitrust practice that Section 2 of the Expediting Act of 1903 * * * bars appeals from interlocutory orders in government civil antitrust cases either to the Supreme Court or the courts of appeals", citing United States v. California Cooperative Canneries, 279 U.S. 553, 558, 49 S.Ct. 423, 73 L.Ed. 838 (1929). It is our task to determine whether or not the "commonplace" of antitrust practice shall stand or fall at this stage of the proceedings. To this end, a careful examination of the terms and legislative history of 28 U.S.C.A. § 1292(a) (1) is necessary.

Section 1292(a) (1) is derived from Section 7 of the Evarts Act, the Act of March 3, 1891, 26 Stat. 828, which provided: "That where, upon a hearing in equity in a district court, or in an existing circuit court, an injunction shall be granted or continued by an interlocutory order or decree, *in a cause in which an appeal from a final decree may be taken under the provisions of this act to the*

---

2. Subsection (b) of 28 U.S.C.A. § 1292 provides as follows: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order * * *." The trial judge in the case at bar did not make any findings as specified in this subsection. Its provisions, therefore, do not concern us here.

3. Section 2 of the original Expediting Act of 1903, 32 Stat. 823, provided: "That in every suit in equity pending or hereafter brought in any circuit court of the United States under any of said Acts. [of which the Act at bar is one], wherein the United States is complainant, including cases submitted but not yet decided, an appeal from *the final decree of the circuit court* will lie only to the Supreme Court and must be taken within sixty days from the entry thereof: *Provided*, That in any case where an appeal may have been taken from *the final decree of a circuit court* to the circuit court of appeals before this Act takes effect, the case shall proceed to a *final decree* therein, and an appeal may be taken to the Supreme Court in the manner now provided by law." (Emphasis added.)

*circuit court of appeals*, an appeal may be taken from such interlocutory order or decree granting or continuing such injunction to the circuit court of appeals * * *." (Emphasis added.)

The substance of this Act was repeated in the Act of June 6, 1900, ch. 803, 31 Stat. 660, referred to hereinafter in connection with United States v. California Coöperative Canneries, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838 (1929).

It would appear that since interlocutory injunction orders were unreviewable in many cases subject to direct appeal to the Supreme Court at that time, the undesirable practice arose of alleging spurious constitutional questions to bring cases within one such class of direct appeal and therefore to foreclose review of orders relating to preliminary injunctions.[4] It is stated by the United States on its brief that Congress had thought to remedy this situation by amending Section 7 of the Evarts Act, "To bring within the court of appeals' jurisdiction interlocutory injunction orders 'in any cause'."

The amending Act to Section 7 of the Evarts Act, the Act of April 14, 1906, 34 Stat. 116, provided: "That where, upon a hearing in equity in a district or in a circuit court, or by a judge thereof in vacation, an injunction shall be granted or continued, or a receiver appointed by an interlocutory order or decree, *in any cause* an appeal may be taken from such interlocutory order or decree granting or continuing such injunction, or appointing such receiver, to the circuit court of appeals * * *." (Emphasis added.)

Whatever may have been the intention of Congress in enacting this amendment, as asserted by the United States, the practical effect seems to have been to include orders appointing receivers within the ambit of immediately reviewable interlocutory orders and the old question

remained unanswered, insofar as we can determine, namely, whether or not an interlocutory appeal could be allowed to a court which did not have jurisdiction to hear and adjudicate the appeal upon a final judgment.

The United States asserts, however, that the legislative purpose of the previously quoted 1906 amendment to Section 7 of the Evarts Act was to permit review of such interlocutory injunction orders by the courts of appeals. In support of this assertion, the United States points to the subsequent codification of Section 7 of the Evarts Act by the Judicial Code of 1911, 36 Stat. 1087, 1134. The 1911 Code, which was positive law as is the present Judicial Code, deleted the phrase "in any cause" which had been added to Section 7 of the Evarts Act by the 1906 amendment, and in its place inserted in Section 129 of the new Code the following clause: "notwithstanding an appeal in such case might, upon final decree under the statutes regulating the same, be taken directly to the Supreme Court." This quoted clause assuredly had the effect, at least as of the effective date of the Judicial Code of 1911, of permitting an appeal from an interlocutory order even in an antitrust case, such as the order *sub judice*, to a court of appeals. Indeed, the Senate Report on the bill which was to enact the 1911 Code states that the change was made "to remove any doubt upon this point." [5]

In 1925, however, the Judicial Code of 1911 was amended by the celebrated "Judges' Bill", 43 Stat. 936, 937, whereby the certiorari jurisdiction of the Supreme Court as we know it today was inaugurated. The 1925 amendments obliterated the previously quoted "notwithstanding" clause of Section 129 of the 1911 Code, leaving, however, the remainder of Section 129 essentially unchanged. The memorandum which accompanied the "Judges' Bill", prepared under the auspices of the Supreme Court, stated that

4. See 40 Cong.Rec. 1723, 4856–4857.

5. See S.Rep. 388, 61st Cong., 2d Sess., p. 53.

the "notwithstanding" clause of Section 129 of the 1911 Code had been "eliminated as having no further application in view of the repeal of the existing provisions of Section 238 providing for direct appeals." [6]

The United States contends that the meaning of the words quoted is clarified by an examination of Section 238 of the 1911 Code and the amendments to that section proposed by the Judges' Bill and effected by Congress in 1925. Section 238 of the 1911 Code, 36 Stat. 1087, 1157, as it was prior to the amendments simply specified the cases in which direct appeals and writs of error were allowed to the Supreme Court.[7] But the Judges' Memorandum states the following: "The amended section [238] sets forth the only remaining instances in which there is a right of direct review in the Supreme Court of decisions of the district courts, following the repeal of the existing provisions of section 238 and of the provisions of the act of March 3, 1887, authorizing direct appeals from the district court to the Supreme Court in suits against the United States and expressly repealed in section 13 of the bill." [8]

Examination of Section 238 of the Judicial Code as amended in 1925, 43 Stat. 938, demonstrates the types of civil cases in which direct appeals of interlocutory injunctions to the Supreme Court of the United States were to be allowed. Most of these are cases of the kind colloquially known today as "Three-Judge Cases", presently embraced in Chapter 155 of Title 28 U.S.C.A. The 1925 amendment

to Section 238, 43 Stat. 938, expressly provided: "A direct review by the Supreme Court of an interlocutory or final judgment or decree of a district court may be had where it is so provided in the following Acts or parts of Acts, and not otherwise: (1) Section 2 of the Act of February 11, 1903, 'to expedite the hearing and determination' of certain suits brought by the United States under the antitrust or interstate commerce laws, and so forth." But Section 2 of the Expediting Act, the Act of February 11, 1903, 15 U.S.C.A. § 29, had and has no provision for a direct appeal of an interlocutory order to the Supreme Court or to a court of appeals. Since the appeal is from a decree of a single district judge the provisions of 28 U.S.C.A. § 1253 are not available to aid the defendants here.

The United States alleges in an intricate and ingenious argument that the "notwithstanding" caveat of Section 129 of the 1911 Code was eliminated because Congress and the Justices of the Supreme Court, in effecting the revisions required by the institution of the certiorari system, felt that the caveat was unnecessary and that the language of the 1911 Code and the background and the legislative history of the 1925 amendments would be sufficient to demonstrate that a circuit court of appeals had the power to review an order of the kind appealed from here. On balance one might consider that Congress, in revising Section 238 in 1925, might have inadvertently concluded that Section 2 of the Expediting Act did con-

---

6. See Hearings on S. 2060 and S. 2061 before a Subcommittee of the Senate Judiciary Committee, 68th Cong., 1st Sess., p. 12.

7. Section 238 prior to 1925 provided: "Appeals and writs of error may be taken from the district courts, including the United States district court for Hawaii, direct to the Supreme Court in the following cases: In any case in which the jurisdiction of the court is in issue, in which case the question of jurisdiction alone shall be certified to the Supreme Court from the court below for decision; from the final sentences and decrees in prize

causes; in any case that involves the construction or application of the Constitution of the United States; in any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority is drawn in question; and in any case in which the constitution or law of a State is claimed to be in contravention of the Constitution of the United States." 36 Stat. 1157.

8. Note 5, supra. See also the same document, "Jurisdiction of the Circuit Courts of Appeals", p. 22.

tain provisions for appeals of interlocutory orders to the Supreme Court; otherwise, the matter would not have been referred to in the terms that it was. But we may not assume that Congress committed an inadvertent error. Moreover, we have to discuss the meaning and the effect of United States v. California Cooperative Canneries, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838 (1929), and what was the state of the law prior to this decision and what was its condition immediately afterward.

In United States v. California Cooperative Canneries (California Canneries), supra, the United States had brought suit in the Supreme Court of the District of Columbia against certain meat packers to prevent a monopoly in food products and had procured a consent decree. About four years after the decree was entered two of the defendants, Swift and Armour, filed motions to vacate the decree. These motions were denied and appeals were taken to the Court of Appeals of the District of Columbia. That court certified questions to the United States Supreme Court, which ordered the entire record sent up to it and held that, because the Expediting Act provided for a direct appeal to the Supreme Court in suits in equity under the antitrust laws, the Court of Appeals of the District of Columbia "was without jurisdiction" to consider the appeals.

But Mr. Justice Brandeis went on to say, "An obstacle to the enforcement of the consent decree remains." He referred to an order of the Supreme Court of the District of Columbia that had suspended the operation of the consent decree as a whole "until further order of the court to be made, if at all, after a full hearing on the merits according to the usual course of chancery proceedings." This order was entered on a motion of California Canneries which had been permitted to intervene four years after the entry of the consent decree, under the following circumstances.

Canneries had alleged as the basis for its intervention that the consent decree interfered with a contract made by it with Armour under which Armour agreed to buy fruit from Canneries. Canneries' petition, accompanying its motion, charged that the consent decree was void because the Supreme Court of the District was without jurisdiction to enter the decree and prayed that it be vacated. The Supreme Court of the District denied Canneries' application to intervene and Canneries then appealed to the Court of Appeals of the District of Columbia. The Court apparently did not long weigh the issue as to whether it had jurisdiction, or certain other issues going to procedural limitations; it simply reversed the order denying the intervention and ordered "that such further proceedings thereupon be had as are necessary to determine the issue raised. * * * *"

The United States then moved in the Court of Appeals that that court vacate its judgment directing that Canneries be given leave to intervene. The Court of Appeals denied this motion without either opinion or comment. The Supreme Court granted certiorari to review the refusal of the Court of Appeals to grant the relief sought by the United States. In supporting the position of the Court of Appeals, Canneries contended in the Supreme Court that the appeal was not within the purview of Section 2 of the Expediting Act because it was not "an appeal from the final decree",[9] and for other reasons which need not be stated here. See 279 U.S., pp. 557–558, 49 S.Ct. pp. 424–425.

9. Section 2 of the Expediting Act in the form in which it was before the Supreme Court was as follows: "That in every suit in equity pending or hereafter brought in any circuit [district] court of the United States under * * * [the Anti-Trust Act], wherein the United States is complainant, * * * an appeal from the final decree of the circuit [district] court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof * * *". See 279 U.S. at p. 557, 49 S.Ct. at p. 424, note 2 cited to the text.

The Supreme Court of the United States deemed Canneries' position to be unsound. Mr. Justice Brandeis stated that it was the intention of Congress in enacting the Expediting Act to ensure the speedy disposition of antitrust suits brought by the United States; that before the passage of the Act the opportunities for delay were many, and that appeals lay from the district courts to the courts of appeals and thence to the Supreme Court, and that such appeals could consume at least a year and a half. Furthermore, the Court pointed out that there might be an appeal from an interlocutory decree or from a refusal to grant such relief to a court of appeals under the Act of June 6, 1900, 31 Stat. 660, cited at an earlier point in this opinion. Mr. Justice Brandeis then stated: "These provisions governing appeals in general were amended by the Expediting Act so that in suits in equity under the Anti-Trust Act 'in which the United States is complainant,' the appeal should be direct to this Court from the final decree in the trial court. *Thus, Congress limited the right of review to an appeal from the decree which disposed of all matters,* see Collins v. Miller, 252 U.S. 364 [40 S.Ct. 347, 64 L.Ed. 616]; [10] *and*

*it precluded the possibility of an appeal to either Court from an interlocutory decree."* (Emphasis added.) 279 U.S. at p. 558, 49 S.Ct. p. 425.

The Supreme Court next referred to the comparable jurisdictions of the United States District Courts and the Supreme Court of the District of Columbia and of the then circuit courts of appeals and the Court of Appeals for the District of Columbia and concluded that an appeal by a person permitted to intervene must be to the Supreme Court of the United States. The Court expressly stated that even under the Act of 1891, the Evarts Act, quoted above, "in cases where the appeal was taken direct to [the Supreme] Court from the final decree in the trial court, every appeal thereafter taken in the cause was necessarily also to [the Supreme] Court." 279 U.S. at p. 559, 49 S.Ct. at p. 425.

The Supreme Court concluded, to state it briefly, that an appeal to the Court of Appeals of the District of Columbia from any anti-trust suit interlocutory order, such as an order denying a motion for leave to intervene in an anti-trust suit in which the United States was the complainant,[11] would defeat the purposes of

10. The cited decision holds that a court must determine, *sua sponte* if necessary, whether a judgment is a final one.

11. At the time of the decision in United States v. California Cooperative Canneries, viz., 1929, prior to the adoption of the *new* Federal Rules of Civil Procedure, 28 U.S.C.A., orders denying leave to intervene were deemed to be interlocutory orders. See Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 505, 61 S.Ct. 666, 85 L.Ed. 975 (1941), citing the Canneries case, 279 U.S. 553, 556, 49 S.Ct. 423, 73 L.Ed. 838 (1929), and Allen Calculators Co. v. National Cash Register Co., 322 U.S. 137, 142, 64 S.Ct. 905, 908, 88 L.Ed. 1188 (1944), in which it was said "The challenged order is but an order in the cause and not the final judgment". The order referred to was an order denying a petition for leave to intervene. See also Ford Motor Co. v. Bisanz Bros., Inc., 249 F.2d 22, 26 (8 Cir. 1957), in which an able Court of Appeals by Circuit Judge Sanborn stated: "If the order under review was

purely discretionary, under Rule 24(b) (2), the question of its appealability would be a troublesome one. Prior to the adoption of the Federal Rules of Civil Procedure it had been consistently the ruling of this Court and that of the Supreme Court that such an order was not appealable. See: Swift v. Black Panther Oil & Gas Co., 8 Cir., 244 F. 20, 30; Palmer v. Bankers' Trust Co., 8 Cir., 12 F.2d 747, 754, and cases cited; Mackey v. City of Little Rock, 8 Cir., 94 F.2d 546, 548; United States v. California Cooperative Canneries, 279 U.S. 553, 556, 49 S.Ct. 423, 73 L.Ed. 838, and cases cited. We are in accord with the statement in Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 506, 61 S.Ct. 666, 668, 85 L.Ed. 975, that, with respect to a conventional form of intervention, where an appeal is made to a trial court's 'good sense to allow persons having a common interest with the formal parties to enforce the common interest with their individual emphasis * * * the circumstances under which interested out-

the Expediting Act. The basis for the Supreme Court's decision as stated in California Canneries is perfectly plain. It was that the Expediting Act amended the prior law and did away with appeals from interlocutory orders and decrees in anti-trust suits.

The Act of April 11, 1928, ch. 354, 45 Stat. 422, not relevant to, and therefore not discussed in, the decision of the Supreme Court in the California Canneries case, supra, made certain changes in subdivision (b), paragraph 1 of Section 128 of the Judicial Code as effected by the 1925 amendments. The 1928 amendment altered that section so as to read: "First, To review the interlocutory orders or decrees of the district courts, including the District Courts of Alaska, Hawaii, Virgin Islands, and Canal Zone, which are specified in section 129." The amendment obviously was intended primarily to affect the statute law of Alaska, for the same amending Act also repealed section 1339 of the Compiled Laws of Alaska of 1913. We will assume *arguendo* as the legislative history perhaps indicates, that the congressional mind did not concern itself with any other objective than the Alaska law at the time of this enactment and we will assume again *arguendo* that the situation in respect to appeals from suits brought under the Expediting Act remained unchanged. The 1940 Codification need not concern us long for it did not become substantive, or positive law, nor did it affect or purport to affect, interlocutory decrees in cases such as that at bar. We therefore come at long last to the 1948 Judicial Code.

The pertinent provision of the 1948 Judicial Code is 28 U.S.C.A. § 1292(1) (1949), the immediate forerunner of the present interlocutory appeals statute, 28 U.S.C.A. § 1292(a) (1) (1962 Supp.). Section 1292(1) as codified in 1948 provided that review may be had in the courts of appeals from: "Interlocutory orders of the district courts of the United States * * *, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, *except where a direct review may be had in the Supreme Court.*" (Emphasis added.) The provisions of the present statute, 28 U.S.C.A. § 1292(a) (1) are, with the exception of certain minor changes which do not concern us here, identical.

The draftsmen of the 1948 Code had confided to them by Congress a task of revision and of codification, not of creation. See S.Rep. 159, accompanying H. R. 3214, 80th Cong. 2d Sess., the Act of creation of the 1948 Judicial Code. The Reviser's Notes to Section 1292 of the 1948 Code, 28 U.S.C. (Cong. Service) (1948), at pp. 1828–1829, indicate some textual changes were made in order to clarify Section 1292 in the light of the then "new" Federal Rules of Civil Procedure. See the statements respecting alterations to conform to Rule 65, 28 U.S. C.A. But there is also language in the "Reviser's Notes" which indicates that Section 225(b) of the 1940 Codification of Title 28 (which did not, as we have stated, become substantive or positive law) was considered as a basis for Section 1292 of the 1948 Code. Section 225 (b) provided for appeals of interlocutory orders and decrees from the district courts to the courts of appeals in equity cases whether or not the United States was a party without reference to the Expediting Act.

But the draftsmen of the 1948 Code went further. As we have pointed out, the provisions of Section 1292(1) in the 1948 codification and of Section 1292 (a) (1) in the current Code state that the courts of appeals have jurisdiction to review interlocutory decrees of the district courts *"except where a direct review may be had in the Supreme Court"*. (Emphasis added.)

■ The naked words of Section 1292 (a) (1) of the current Code, 28 U.S.C.A.

siders should be allowed to become participants in a litigation is, barring very

special circumstances, a matter for the nisi prius court.' "

§ 1292(a) (1) (1962 Supp.), certainly permit the construction that both the appellants and the appellee would have us put upon them here. It should be noted that 28 U.S.C.A. § 1291, relating to appeals from final decisions of district courts, provides that the courts of appeals may review all final decisions of the district courts "except where a direct review may be had in the Supreme Court." As we have said, the identical exception clause is utilized in Section 1292(a) (1) with regard to interlocutory orders of the district courts. It would appear, therefore, that the congressional intent is plain, when one reads the two sections together, that both final and interlocutory orders of the district courts are to be reviewable by the courts of appeals unless a direct review by the Supreme Court is provided for the order, be it interlocutory or final, sought to be reviewed by a court of appeals.

In fact, it is extremely difficult and requires doing violence to the language of the statute to escape the conclusion that interlocutory orders, such as the one at bar, are reviewable by a court of appeals excepting and only excepting those types of cases in which an interlocutory order is directly reviewable by the Supreme Court.[12] There are no other exceptions or terms of limitation in the statute.

Our conclusion may result in some ambiguous situations for one can certainly without difficulty imagine cases in which a court of appeals could enter an erroneous judgment. The case at bar may furnish a vivid contemporaneous example. But even if this is so and we are wrong in our conclusion that we have jurisdiction here, the Supreme Court has available the certiorari process to correct our error. In any event we hold we have jurisdiction to entertain the instant appeal.

II.

The suit out of which the interlocutory injunction issued was filed on February 14, 1963. The injunction issued on March 6, 1963, to prevent the defendants-appellants from carrying out certain agreements contemplating corporate acquisitions in companies engaged in manufacturing underground coal mining machinery in the United States. On March 14, 1963, the court denied a proposal by the defendants to modify the injunction of March 6.

The court below, however, did not file its findings of fact and conclusions of law, its opinion [13] and supplemental opinion until April 11, 1963. This is an undesirable practice. An interlocutory or other injunction should not be filed unless findings of fact and conclusions of law are filed with the decree as required by Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A. On April 1, 1963, the defendants filed in this court a petition entitled a petition for a "Writ Authorized by 28 U.S.C. § 1651". This is in the nature of an application for mandamus to compel the court below to determine whether the preliminary injunction should be vacated.[14] Notice of appeal

---

12. It is very difficult, if not impossible, to construe the statute to mean that the courts of appeals shall have jurisdiction to review interlocutory orders *except* in those cases where, had the order been final, it would have been directly reviewable in the Supreme Court.

   Putting it bluntly, the legislative history is a labyrinth but certainly whether it was or was not the congressional intent to relieve the effect of the California Canneries case, the provisions of Section 1292(a) (1), by the "excepting" clause, have done so.

   We are informed and we think it not improper to state that the Department of Justice is contemplating the introduction of a bill in the present Congress to do away with what seems to be the common belief in antitrust practice, that Section 2 of the Expediting Act will permit an appeal only on final judgment to the Supreme Court. See the opening paragraph of the appellee's brief.

13. 218 F.Supp. 530 (W.D.Pa.1963).

14. In a document accompanying the petition counsel for the petitioners, the defendants, stated that the "main reason" for filing the petition was to try to hold a place on the calendar of this court for hearing on April 22, 1963.

**518**

having been filed on April 12, 1963, the case was brought on for hearing before us on April 22, 1963. We are able to dispose of the appeal on the merits and the application for relief under 28 U.S. C.A. § 1651 has therefore been rendered moot.

The findings of fact made by the court below are as follows.[15] Ingersoll-Rand Company (Ingersoll-Rand) entered into three separate agreements, dated January 16, 1963, with the defendants, the Goodman Manufacturing Company (Goodman), Lee-Norse Company (Lee-Norse), and Galis Electric and Manufacturing Company (Galis).

The agreement with Goodman provides that Ingersoll-Rand will acquire certain of the assets of the mining and rock crushing machinery and industrial manufacturing business of Goodman for $8,000,000 the date of the closing to be March 1, 1963 unless duly extended. The agreement with Goodman further provides that after closing Goodman will not use the Goodman name either alone or in combination with other words in the conduct of any business relating to mining and rock crushing machinery or industrial manufacturing and that Goodman will use its best efforts to enable Ingersoll-Rand to use the name Goodman.

The agreement between Ingersoll-Rand and Lee-Norse provides for a plan and agreement of reorganization whereby a wholly owned subsidiary of Ingersoll-Rand, to be designated Goodman-Norse Company, will purchase all property of Lee-Norse in exchange for a specified quantity of Ingersoll-Rand voting stock and that within twelve months after the closing date of March 1, 1963, unless that date be duly extended, Lee-Norse will dissolve and distribute its remaining assets, viz., Ingersoll-Rand voting stock, to its shareholders.

The agreement between Ingersoll-Rand and Galis provides for a plan of reor-

ganization under which Ingersoll-Rand will acquire all issued and outstanding shares of Galis stock in exchange for shares of common stock of Ingersoll-Rand and that all officers and directors of Galis will resign. The closing date of March 1, 1963 is also specified for this agreement, unless that date be duly extended.

Each of the defendants is engaged in interstate commerce. Ingersoll-Rand is a world-wide designer and manufacturer of industrial machinery which includes compressors, rock drilling equipment, air and electric tools, pumps, mining hoists and other machine products. Goodman is one of the nation's leading manufacturers of underground coal mining machinery. It is engaged in the production and sale of continuous miners, coal cutters, loading machines, conveyors, shuttle cars, mine locomotives, and other products for coal mining. Lee-Norse is one of the nation's largest manufacturers of continuous miners. In 1961 it accounted for more than 50% of this nation's sales of continuous miners. Galis Electric and Machine Company manufactures roof drills, facing drills, utility cars and other products for use in underground coal mining machines.

As of December 31, 1961, Ingersoll-Rand had total assets of $186,107,000 and total sales of $181,362,000. As of the same date Goodman had total assets of $16,276,000 and total sales of $14,339,000. As of September 30, 1962, Lee-Norse had total assets of $4,475,000 and total net sales of $12,648,000. As of December 31, 1961 Galis had total assets of $2,149,000 and total sales of $1,420,000.

The dominant and substantial products of manufacture of the three companies to be acquired relate to equipment used in underground coal mining.

Prior to entering into the agreements involved herein, Ingersoll-Rand had a

15. We have not included in this review all findings of fact made by the court below for they number 169 and cover 36 legal-size typewritten pages. We have, however, set out those which we deem essential to our decision.

study and a report made by Mr. W. L. Wearly to determine the desirability of entering the mining machinery industry. The study found that the manufacture and sale of underground coal mining machinery has been profitable over the last ten years. For more than half this period it appears that the net profit before taxes ranges from 8% to 33% with the leading manufacturers. The Wearly Report recommended the acquisitions by Ingersoll-Rand of its co-defendants. Based on a projection that coal will supply 70% of the fossil fuel requirements for steam electric plants in 1975 and that the coal machinery market will have substantial growth during the next ten years, the Wearly study states that the coal industry itself has recognized the advantage of the latest type of mechanization as indicated from the upturn in the sale of mining machinery during the first six months of 1962.

The basic method of removing coal depends upon the nature of its placement in the earth. There are two methods of removal, viz., the underground method and the strip method. The underground method of mining coal is accomplished by using either a "continuous miner", which mines coal without the use of explosives, or conventional face coal mining machinery, which ordinarily employs a complement of units of equipment. When coal is mined by face coal mining machinery, there are four necessary steps in the operation: undercutting, drilling, blasting, and loading the coal. Strip mining, on the other hand, is conducted above ground in an open pit, and differs from underground mining in several respects. The issues in the appeal at bar involve underground mining, and therefore we need not concern ourselves further with the strip mining method.

Continuous miners have certain characteristics which render them readily distinguishable from other types of coal mining machinery in that continuous miners combine in the one machine the several processes usually performed by several individual machines: viz., undercutting, drilling, blasting, and loading. Underground coal mining operators constitute the only market for continuous miners with comparatively rare exceptions. There are between 125 and 150 coal companies with mines producing over 2,000 tons a day. These companies are the primary consumers of continuous miners. It seems clear that the continuous miner produces coal with greater productivity than any other kind of face equipment. The safety factor is also improved by the use of the continuous miner.

Competitors in the field of continuous miners are Goodman, Lee-Norse, Charleroi, Wilcox, Joy, Jeffrey, and National Mine Service. The Vice-President of Sales for Jeffrey, who had had 40 years of experience in the industry, did not know of any continuous miners sold in the years 1960–1962 by any company other than by the seven named in the preceding sentence.

Lee-Norse's continuous miner is a ripper type machine and today holds the number one position in continuous-miner sales. This machine has extensive patent coverage. The Rochester and Pittsburgh Coal Company buys continuous miners from Jeffrey, Joy and Goodman but not from National Mine Service. The Rochester and Pittsburgh Company considers the four companies last named to be the only manufacturers of continuous miners. Lee-Norse's continuous miner appears currently to dominate the market with an annual sales volume of from 4 million to 5 million according to estimates set out in the Wearly Report. Lee-Norse received more than 95% of its 1961 sales dollars from the manufacture and sale of continuous miners. Total sales of continuous miners in the industry for 1961 are estimated to have been approximately 10.6 million dollars. Only a very small volume of continuous mining machinery is imported into the United States, approximately less than 1% of

the United States total: only a very small amount of such equipment is exported by American manufacturers. Of all the bituminous and lignite coal mined underground, about 30% is mined by continuous mine process. In 1948 the percentage of coal mined by the continuous mining process was practically nil and by 1961 the percentage of bituminous and lignite coal mined in the United States was, as has been stated, 30%. The development of new machinery in the industry is an expensive proposition; development of the continuous miner, for example, could cost between $700,000 and $1,000,000.

Face coal mining machinery and equipment is that type of underground mining machinery used in the primary extraction of coal at the face. Such equipment is of two basic types: First, the continuous miner, and second, the several types of conventional equipment, the latter including, as we have indicated, a complement of equipment consisting essentially of a cutter, face drill, loading machines, and roof drill. These are separate machines which will have purposes similar to that for which the continuous miner is employed. The total industry sales of face coal mining machinery and equipment in 1961 amounted to about 23 million dollars.

All products in the various categories of continuous miners, face coal mining machinery and equipment, and underground coal mining machinery and equipment, are sold uniformly by manufacturers throughout the United States wherever coal is mined underground and the appropriate geographical area of effective competition within which the probable anticompetitive effects of the proposed acquisitions are to be tested is the United States in totality. The localities, widespread throughout this country, where coal is mined underground, represent the critical competitive area.

The sales of continuous miners by the defendants in the year 1961 amounted to $6,395,000 or approximately 61.5% of the total industry shipments of $10,600,000.[16]

The value of sales as a percent share of continuous miners for Lee-Norse and Goodman as contrasted with other companies for the year 1958 is as follows: For other companies, 57.5%, for Lee-Norse and Goodman, 42.5%; 1959, for other companies, 52.8%, for Lee-Norse and Goodman, 47.2%; 1960, for other companies, 39.3%, for Lee-Norse and Goodman, 60.7%; and 1961, for other companies, 39.9%, for Lee-Norse and Goodman, 60.1%.

As to unit sales in continuous mining machinery for the year 1958, for other companies, 55.4%, for Lee-Norse and Goodman, 44.6%; 1959, for other companies, 52%, for Lee-Norse and Goodman, 48%; 1960, for other companies, 46.1%, for Lee-Norse and Goodman, 53.9%; and 1961, for other companies, 42.3%, for Lee-Norse and Goodman, 57.7%.

We shall not set out in this opinion in detail the findings of the court below as to the percentage of total production of bituminous coal and lignite in the United States by type of mining. It is sufficient to state here that the court below found that the underground production by hand loading at the middle of the calendar year 1961 was less than 10%, whereas the percentage of coal mined by continuous mining equipment had risen from almost zero in 1950 to above 21% by the middle of the year 1961 and that the production of underground coal mechanically loaded had increased from 30+% in 1940 to 60% by the end of the year 1961.

---

16. Compare the figures as reported to the Bureau of the Census and the Business and Defense Services Administration. See also the inconsistent figure of $10,-398,000 as set out in finding of fact No.

89. Contrast the figure that we have referred to, $10,600,000, set out in finding of fact No. 55. The difference is so small, however, as to be immaterial for the purposes of this opinion.

The court also found that sales of face coal mining machinery and equipment by Lee-Norse and Galis in 1961 amounted to $6,474,000 or 27.9% of the total industry shipments of $23,-192,000. A finding of fact states "Similar information was not supplied for Goodman for 1961."[17] The defendants' sales of face coal mining equipment for 1962 amounted to $12,972,000, exceeding the total sales of all the other companies that reported their sales to the United States Department of Justice. These companies made up over 85% of the face mining machinery and equipment industry. The defendants' sales of face coal mining machinery and equipment amounted to $9,565,918 or 43.1% of the total sales of all companies which amounted to $22,172,404.

In addition to continuous miners Lee-Norse also manufactures jitneys and portal buses. In addition to continuous miners Goodman also manufactures cutters, loaders, belt conveyors, mine locomotives, shuttle cars and other products. Galis manufactures roof drills, face drills, utility cars, and portal cars.

Ingersoll-Rand manufactures rock drills and rock crushing machinery which it seeks to complement by the acquisition of a full line of face coal mining machinery and equipment.

If it is successful in effecting the mergers and combinations complained of Ingersoll-Rand would become a full-line manufacturer of face coal mining machinery and equipment as well as of continuous miners of both borer and ripper types. A broad line of products possessed by some companies in the coal mining machinery industry is an advantage to them in their sales efforts. The acquisitions complained of, if consummated, might create a sales advantage for Ingersoll-Rand because that company would then be in a position to make package deals. Ingersoll-Rand has a financial subsidiary which makes loans to its customers, manufacturers, suppliers and others. If the proposed acquisitions are made the merged company would probably have the broadest line in the coal mining machinery and equipment field.

The court below then made the following finding which is vital: "The company [Ingersoll-Rand] putting these units together will, with their financial resources, and with the finance company which Ingersoll-Rand already has established, tend to create a monopoly by elimination of competition now enjoyed by other companies in this line of commerce."[18]

There are findings of fact which need not be recited here, that indicate that the acquisition of Galis, the smallest of these companies, is of some importance when considered as part of the whole combination. Other findings of fact tend to indicate that the acquisitions contemplated by Ingersoll-Rand would substantially reduce the number of suppliers of coal mining machinery, particularly of the continuous miners and also of face coal mining machinery and equipment. Government Exhibit No. 105 is illustrative. This is a list of sales by major manufacturers of underground coal mining machinery and equipment and would tend to indicate a dominant position in the market if the combination complained of is completed. Finding No. 157, in pertinent part, is as follows:

DOLLAR SALES—CONTINUOUS MINERS

|  |  | Dollars | Per-cent of Industry |
|---|---|---|---|
| Lee-Norse | 1958 | 2,866,337 | 27.5 |
|  | 1959 | 4,673,305 | 34.6 |
|  | 1960 | 5,656,918 | 48.5 |
|  | 1961 | 4,990,403 | 48.0 |
|  | *1962 | 7,227,285 | 51.2 |
| Goodman | 1958 | 1,563,731 | 15.0 |
|  | 1959 | 1,703,765 | 12.6 |
|  | 1960 | 1,425,943 | 12.2 |
|  | 1961 | 1,404,975 | 13.5 |
|  | *1962 | 1,691,280 | 12.0 |

17. See Finding of Fact No. 96.

18. Finding of Fact No. 110.

* Incomplete Year

## DOLLAR SALES—CONTINUOUS MINERS

| | | Dollars | Per cent of Industry |
|---|---|---|---|
| Sub-Total | 1958 | 4,430,068 | 42.5 |
| | 1959 | 6,377,070 | 47.2 |
| | 1960 | 7,085,861 | 60.7 |
| | 1961 | 6;395,378 | 61.5 |
| | *1962 | 8,918,565 | 63.2 |
| All other companies | 1958 | 5,982,361 | 57.5 |
| | 1959 | 7,143,739 | 52.8 |
| | 1960 | 4,592,103 | 39.3 |
| | 1961 | 4,002,622 | 38.5 |
| | *1962 | 5,202,070 | 36.8 |

## UNIT SALES—CONTINUOUS MINERS— ALL COMPANIES

| | | Units | Per cent of Industry |
|---|---|---|---|
| Lee-Norse | 1958 | 38 | 33.9 |
| | 1959 | 60 | 40.5 |
| | 1960 | 67 | 47.5 |
| | 1961 | 57 | 51.4 |
| | 1962 | 81 | 53.6 |
| Goodman | 1958 | 12 | 10.7 |
| | 1959 | 11 | 7.5 |
| | 1960 | 9 | 6.4 |
| | 1961 | 7 | 6.3 |
| | 1962 | 10 | 6.7 |
| Sub-Total | 1958 | 50 | 44.6 |
| | 1959 | 71 | 48.0 |
| | 1960 | 76 | 53.9 |
| | 1961 | 64 | 57.7 |
| | 1962 | 91 | 60.3 |
| All other companies | 1958 | 62 | 55.4 |
| | 1959 | 77 | 52.0 |
| | 1960 | 65 | 46.1 |
| | 1961 | 47 | 42.3 |
| | 1962 | 60 | 39.7 |

## DOLLARS SALES—FACE COAL MINING MACHINERY & EQUIPMENT

| | | Dollars | Per cent of Industry |
|---|---|---|---|
| Lee-Norse | 1958 | 2,866,337 | 16.2 |
| | 1959 | 4,673,305 | 20.9 |
| | 1960 | 5,659,918 | 27.7 |
| | 1961 | 4,990,403 | 28.1 [19] |
| | *1962 | 7,272,285 | 32.2 |
| Goodman | 1958 | 1,563,000 | 8.8 |
| | 1959 | 1,703,000 | 7.6 |
| | 1960 | 1,425,000 | 6.9 |
| | 1961 | 1,404,000 | 7.9 |
| | *1962 | 1,691,000 | 7.5 |
| Galis | 1958 | None | None |
| | 1959 | 436,000 | 2.0 |
| | 1960 | 778,000 | 3.8 |
| | 1961 | 1,484,000 | 8.3 |
| | *1962 | 1,845,000 | 8.2 |
| Sub-Total | 1958 | 4,429,337 | 25.0 |
| | 1959 | 6,812,305 | 30.5 |
| | 1960 | 7,862,918 | 38.4 |
| | 1961 | 7,878,403 | 44.3 |
| | *1962 | 10,763,285 | 47.9 |
| All other companies | 1958 | 13,298,908 | 75.0 |
| | 1959 | 15,522,893 | 69.5 |
| | 1960 | 12,606,486 | 61.6 |
| | 1961 | 9,889,561 | 55.7 |
| | *1962 | 11,710,714 | 52.1 |

## DOLLAR SALES—UNDERGROUND COAL MINING MACHINERY AND EQUIPMENT

| | | Dollars | Per cent of Industry |
|---|---|---|---|
| Lee-Norse | 1958 | 2,866,337 | 8.8 |
| | 1959 | 4,673,305 | 11.4 |
| | 1960 | 5,659,918 | 14.7 |
| | 1961 | 4,990,403 | 13.6 |
| | *1962 | 7,227,285 | 17.3 |

* Incomplete Year

19. There may be an inconsistency or discrepancy in respect to the fourth item relating to Lee-Norse and that set out in finding of fact No. 88. Of this we cannot be certain on the present record. If there be a discrepancy it does not appear to us to be of such a substantial nature as to constitute a ground for different conclusions than those reached by the court below.

DOLLAR SALES—UNDERGROUND COAL MIN-
ING MACHINERY AND EQUIPMENT

| | | Dollars | Per-cent of Indus-try |
|---|---|---|---|
| Goodman | 1958 | 4,580,000 | 14.1 |
| | 1959 | 5,459,000 | 13.3 |
| | 1960 | 6,087,000 | 15.8 |
| | 1961 | 4,458,000 | 12.1 |
| | *1962 | 3,900,000 | 9.4 |
| Galis | 1958 | None | None |
| | 1959 | 436,000 | 1.0 |
| | 1960 | 778,000 | 2.0 |
| | 1961 | 1,484,000 | 4.0 |
| | *1962 | 1,845,000 | 4.4 |
| Sub-Total | 1958 | 7,446,337 | 22.9 |
| | 1959 | 10,568,305 | 25.7 |
| | 1960 | 12,524,918 | 32.5 |
| | 1961 | 10,932,403 | 29.7 |
| | *1962 | 12,972,285 | 31.1 |
| All other companies | 1958 | 25,053,443 | 77.1 |
| | 1959 | 30,480,651 | 74.3 |
| | 1960 | 26,045,428 | 67.5 |
| | 1961 | 25,865,658 | 70.3 |
| | *1962 | 28,673,719 | 68.9 |

The court below concluded that the three companies to be acquired by Ingersoll-Rand do and may be expected reasonably to continue to do a business larger in dollar volume than any other company in the face coal mining machinery and equipment industry, and that the acquisitions will reduce the number of manufacturers of conventional face coal mining machinery and equipment from six to four as has already been stated. The acquisitions will increase the already substantial degree of concentration among the manufacturers of continuous miners.

The court below also found that Ingersoll-Rand is a large manufacturer of general industrial machinery, purchases large quantities of steel and that its purchases are important to the steel companies, and that the steel industry is one of the largest markets for coal. If Ingersoll-Rand is permitted to acquire the corporate acquisitions sought by it, its competitive position might be enhanced. This is, of course, a mixed finding of fact and law.

■ We have endeavored to give a fair resume, sometimes almost *in haec verba,* as to the findings of fact made by the court below. We wish to make clear, however, that at this juncture we are reviewing the propriety of an interlocutory injunction and that there has been no final hearing; that the facts, after final hearing, when the defendants have had a chance to consummate their defense or defenses in full, may appear of different substance and texture and possess very different legal effects. What we have just said is to be regarded as precatory. As to the findings as they have been made after the interlocutory injunction, we state only that we have examined the voluminous record carefully and we are compelled to the conclusion that there is an evidentiary basis for the findings made and that they are not clearly erroneous. Rule 52(a), Fed.R.Civ.P., 28 U.S. C.A.

### III.

■ An examination of the law discloses also that the court below applied the proper standards to the circumstances of the case at bar. We start, of course, with the fundamental proposition that the issuance of an interlocutory injunction rests within the sound discretion of the trial court and that its discretion may not be interfered with on appeal unless it has been exercised improvidently. Deckert v. Independence Shares Corporation, 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189 (1940). The court below was construing the application of Section 7 of the Clayton Act, 15 U.S.C.A. § 18. It had the task of determining whether it was likely that the acquisitions sought to be made by Ingersoll-Rand would substantially lessen competition and whether a subsequent divestiture would or would not adequately protect the public interest. See Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir.

* Incomplete Year

1953). The court below was not required to find that a substantial lessening of competition was a certainty; a determination of the likelihood of a substantial lessening of competition was sufficient. A private plaintiff must show that hardship or damage will result to it, but where the United States is the plaintiff, as here, the United States is not required to prove public detriment from a merger which would violate the provisions of Section 7. Section 7, by its terms, proscribes acquisitions which "may" have the effect of substantially lessening competition. Congress intended to prohibit transactions with a "probable" anticompetitive effect, and one of the basic objects of Congress was to prevent steps toward concentration of industry in a given field "in their incipiency". Brown Shoe Co. v. United States, 370 U.S. 294, 317–318, 346, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The court below was not required to demonstrate the precise way in which violations of the law might result in injury to the public interest. It was sufficient to show, as did the court below, only that the "threatened act was within the declared prohibition of Congress". See the opinion of the court below.

■■■ The record demonstrates abundantly that the acquisitions which Ingersoll-Rand proposes to make will place under its control companies which have accounted for and will account for a very substantial share of the total industry output in three significant lines of commerce. Ingersoll-Rand will possess or dominate approximately 60% of the industrial field of continuous miners. As to face coal mining machinery and equipment, it will have under its dominance or control about 45% of all production and sales. And as to the broad category of underground coal mining machinery and equipment it will acquire by the acquisitions, if they are permitted to be made, approximately 30% of the industrial field designated. Compare the comparatively small market participation complained of in Brown Shoe Co., supra, where only approximately 5% of the national sales of shoes was in issue. The record demonstrates, as the court below found, that Ingersoll-Rand will be in a favorable position to finance extended operations should it seek to acquire and to enlarge its nascent capabilities of engrossing the markets. The court below determined also that Ingersoll-Rand, by dominating the entire field of underground coal mining machinery, will be in a position to offer a complete line of equipment to its consumers and to further enhance its position and dominance in the market by extending consumer financing to prospective purchasers through its wholly owned subsidiary finance company. Moreover, Ingersoll-Rand is a large purchaser of steel and the steel industry constitutes one of the largest present markets for coal. As the court below cogently pointed out, "It is not overly speculative to assume that the judicious use of its steel-purchasing power by Ingersoll-Rand could immeasurably increase the sales by the acquired companies of machinery and equipment to the coal mining companies which acutely need the continued good will of the steel industry. Moreover, the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantages in securing the good will of the possessor. Certainly the steel producer who seeks orders from Ingersoll-Rand may tend to prefer the acquired companies as the source of supply of equipment used in his 'captive' mines, and the advantages accruing to him from so favoring the acquired companies would not have to be pointed out by Ingersoll-Rand. What may here be involved is the trade practice known as 'Reciprocity'. This is particularly destructive of competition because it transforms substantial buying power into a weapon for 'denying competitors less favorably situated access to the market.' United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1949)." We think it has been demonstrated clearly that the

public interest required the interlocutory relief granted by the court below.

The granting of such relief, of course, cannot be automatic or mandatory. The United States expressly does not make any such contention. The present order does not determine the ultimate rights of the contesting parties but merely maintains the *status quo* until final hearing can be had and final determinations made in this intricate litigation.

In reaching the conclusion that the judgment of the court below should be affirmed we are not unmindful of the admonitions of the recent decision in Sincock v. Terry, 210 F.Supp. 396 (D. Del.1962), a decision dealing with a very different kind of case but on which, nonetheless, emphasis has been placed by the defendants. In Sincock the court stated that there must be no serious dispute as to operative facts and also that it must be shown that there was a reasonable probability of success on final hearing.

As to the first issue stated by Sincock, it appears that the defendants have mistaken the nature of the problem here. The operative facts on which the United States has based its position in all major respects, at this stage of the proceeding, largely appear from public records of departments of the United States and these records establish the probability of the prohibited tendency to lessen competition. As to the second issue as set out in Sincock, we take the view that all the United States is required to establish at the present stage of this case is the probability of a lessening of competition and a showing of a reasonable probability of success on final hearing. We agree with the court below in its conclusion that the United States has met this burden in both respects.

The defendants also assert that irreparable injury will come to them by reason of the decree complained of but we agree with the court below that there is no substantial basis in the evidence for this claim. At least we cannot presently perceive that the court below was in error in concluding that they would not be irreparably injured. The trial court had to weigh the possibility of injury to the defendants, the effect of divestiture as opposed to injunctive relief, and the respective positions of the parties. It decided in favor of granting injunctive relief to the United States. Since we cannot say that the district court's findings of fact were clearly erroneous or that its conclusions of law were wrong, the judgment appealed from will be affirmed.